433 F.2d 1243
 FLORIDA BAHAMAS LINES, LTD., a Bahamian Corporation, Plaintiff-Appellant,
v.
THE STEEL BARGE "STAR 800" OF NASSAU, etc., Defendant-Appellee.
CARIBBEAN TANKER SERVICE, INC., a Florida Corporation, Plaintiff-Appellee,
v.
BARGE "STAR 800" etc., Defendant-Appellee.
 No. 27796.
 United States Court of Appeals, Fifth Circuit.
 October 23, 1970.
 
 Stanley Haves, Arthur Roth, Miami, Fla., for plaintiff-appellant.
 A. M. Schwitalla, Miami, Fla., for appellees.
 Before JOHN R. BROWN, Chief Judge, and TUTTLE and MORGAN, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 This case in admiralty presents two questions. First whether a (ordinarily omnipotent) preferred maritime lien for necessaries — wharfage and repairs — will be held to be subordinate to a foreign ship mortgage when the maritime lien was allowed to accrue through the action or inaction of one who is closely related to the lienor in breach of its duty to the mortgagee, especially when a part of the activities constituted deception, concealment or other sharp practices. Second whether a delay of 47 months by the lienor wharfinger in enforcing its lien cuts off the lienor — due to laches — from asserting it thereafter as prior to the mortgage. We answer both questions affirmatively, reverse the judgment of the Court below, and remand the case for further proceedings.
 
 I. Background — Corporate Craft
 
 2
 We are called upon by mortgagee[1] to extricate it from the intricate labyrinth of corporate legerdemain into which it unwittingly wandered, through the tacit encouragement and direction of a corporate triad — Winsen, Ltd., Winson, Inc., and Caribbean Tanker Service, Inc.,[2] — determined to have its barge and own it too, all at the expense of the mortgagee in the amount of a L 15,000 ($36,000.00 American) mortgage debt.
 
 
 3
 Omnipresent in the background and forefront of these three entities is the ubiquitous Joe Brown, organizer, officer, acting business representative, and principal or substantial stockholder.[3]
 
 
 4
 In October 1964 the steel barge "Star 800", then owned by Winsen, was brought to Miami and berthed at Winson's dock. With the barge still at Winson's dock Winsen, the barge owner, acting through its President Brown executed on May 10, 1965 a foreign ship mortgage on the barge with mortgagee.[4] According to Brown's testimony sometime thereafter in May 1965 he disassociated himself from Winsen.[5] But if this occurred, the mortgagee was unaware of it.
 
 
 5
 Though the warranty in the mortgage was sufficient guaranty for mortgagee that mortgagor would in effect be responsible for any subsequent obligations incurred against the barge which would impair the mortgage security value, the record contains no evidence which did, or should have, placed the mortgagee on constructive or actual notice of the existence of any claim for wharfage or a superior maritime lien. Brown on the other hand, as a result of the interaction between Winsen and Winson, both of which he was president and acting business agent at the time the mortgage was created, was patently aware that Winsen had never paid any of its wharfage obligation to Winson. What Brown knew so knew Winsen and Winson.
 
 
 6
 On February 28, 1968 Brown, acting in his capacity as president of Winson, prepared invoices for the wharfage and repairs that had been accruing against Winsen's barge over the previous 46 months. The claim then totaled about $9,500.00.[6] This was the first demonstrable evidence showing that Winsen actually owed for wharfage. It was, moreover, the first claim for wharfage even on Brown's testimony. He testified that Winsen had made no payment to Winson during the 46 months that the barge had been berthed at its dock. On the other hand, Winson had never made a demand for payment, either written or oral. On the same date that Brown had prepared the invoices, Winson (through Brown) assigned them to Caribbean of which Brown was then the acting business agent, an officer, and substantial or majority stockholder.
 
 
 7
 There is no evidence of the amount of consideration that passed in the assignment, but the invoices had written on them "THIS IS ASSIGNED FOR VALUE RECEIVED". The District Court found as a fact that an assignment had been consummated between Winson and Caribbean, but made no finding on consideration.[7] Since a valid and unqualified assignment operates to transfer to the assignee no greater right or interest than was possessed by the assignor, 6 C.J.S. Assignments § 82, the most Caribbean can claim is that it stands in the shoes of Winson which at best, were ill-fitting if not worn out from the Winsen-Winson dealings at and subsequent to the creation of the ship mortgage, plus even worse, Caribbean was not an arms-length-dealing stranger.[8] This assignment, as was the supposed lien, was a secret one evidenced only by the invoices, which were immediately filed in the offices of Winson and Caribbean, where they remained since the date of the assignment until they were exhumed for the trial.
 
 
 8
 In March, 1968 Winsen transferred title of the barge to Winson. The consideration was "$10.00, good will, and the obligation to clear the mortgage with Barclay's Bank." Thus Winson, a short period after it had assigned away its maritime lien for no visible consideration, purchased the barge for a consideration of $10.00, with full knowledge that the purchase was subject to the existing foreign ship mortgage of $36,000 and a possible maritime lien in the amount of $9,475. The fine hand of Brown runs throughout this and more so it was the fine hand of Brown that successfully concealed from the Court — an admiralty Court exercising its vast equitable powers, Hadjipateras v. Pacifica, S.A., 5 Cir., 1961, 290 F.2d 697, 1961 A.M.C. 1417 — the real facts as to the official title record of the barge as bearing on the persons executing the bill of sale for Winsen to Winson and the circumstances surrounding it.[9]
 
 
 9
 Brown's next furtive step was in March 1968 when, acting for Winson, he executed a bill of sale on the barge to John Wolf in consideration of $8,900.00 cash. Even this could not be clean cut. For some unexplained reason the date on the bill of sale was July 1968. In the bill of sale Brown represented the "Star 800" to be free and clear of all liens. The barge was never delivered to Wolf because it was subsequently libeled by the mortgagee for the purpose of foreclosing on the foreign ship mortgage. Consequently Wolf instituted criminal charges[10] against Brown that since have been dropped in accordance with Brown's agreement to reimburse Wolf.[11]
 
 
 10
 Meanwhile back with the mortgagees, on August 20, 1968 a libel was instituted against Winsen in personam and against the barge in rem to foreclose on the mortgage. Caribbean then initiated its libel in rem against Winson on September 27, 1968 in order to enforce its assigned maritime lien for dockage and repairs but failed to file a notice of pending litigation as is required by Rule 6, subd. D of the Local Rules for the Southern District of Florida.[12]
 
 
 11
 No claim or answer having been filed the mortgagee obtained a default decree in its libel against Winsen and the barge, and the marshal, who had custody of the barge, was ordered to sell it at public sale. The mortgagee was high bidder and purchased the barge. Caribbean thereupon, in the person of Brown, objected to confirmation of the sale and moved for a consolidation of the two actions. The District Court set aside the sale and consolidated the libels for the purpose of determining priority as between the lien claimants. The Judge found, as a fact, that Winson had acquired a valid maritime lien and, that it had assigned the lien to Caribbean, and held the maritime lien to be "first and best", thereby superior to the ship mortgage. Caribbean was allowed to bid up to the amount of its lien ($10,516.02) without cash deposit, and was high bidder. Thus it now owns the "Star 800" for which it paid no cash or other cognizable consideration, and in one fell swoop extinguished the claimed debt that was originally due from Winsen to Winson, now due from Winson to Caribbean, and completely expunged the foreign ship mortgage in the amount of L 15,000 ($36,000.00) to the total loss of the mortgagee.
 
 II. The Merits
 
 12
 The mortgagee contends: [i] that it was incumbent upon Winsen and its transferee Winson — as mortgagors in possession of the mortgaged barge — by and through their president, Joe Brown, to protect the mortgagee's security interest from being impaired by the accrual of any liens upon the barge especially at the hands of alter egos or close affiliates; and [ii] that Winson and Caribbean are "alter egos" of Joe Brown. Thus we must look to the obligations incurred by Winsen, Winson, and Caribbean.
 
 A. Brown's Actions and Knowledge Infect All
 
 13
 The nature of the facts in this case — which need no embellishment — "[m]ake the entire transaction subject to the sharpest scrutiny". Findley v. Lanasa, 5 Cir., 1960, 276 F.2d 907, 909, 1960 A.M.C. 1444, 1446. After such scrutiny we conclude that to deny priority to the mortgagee — pecuniarily "keel hauled" by the practices and manipulations of Joe Brown — would be to exalt the corporate form and to constitute a denial of justice. Indeed, the circumstances of this case are peculiarly attuned to the gentle strains of admiralty's equity jurisdiction which, in "[i]ts traditional liberality * * * seeks out the intrinsic justice of a cause * * *". Vega v. Malula, 5 Cir., 1961, 291 F.2d 415, 416, 1961 A.M.C. 1698, 1699. This Court has repeatedly given fullest play to the concept that admiralty jurisdiction embraces the resources of equity whenever the need arises. See, e. g., Findley v. Lanasa, 5 Cir., 1960, 276 F.2d 907; Hadjipateras v. Pacifica, S.A., supra, and Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Company, 5 Cir., 1962, 303 F.2d 692, 1962 A.M.C. 1710, in which we said:
 
 
 14
 "The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence and, in the role of admiralty judge, dispense, as would his land-locked brother, that which equity and good conscience impels * * *."
 
 
 15
 303 F.2d at 699.
 
 
 16
 When Brown, acting for Winsen mortgaged the barge, he knew two things. First, so his 1968 invoices revealed, there was a lien for wharfage covering October 1964 to May 1, 1965, the date of the mortgage (see item 1 n. 6, supra). Second, despite this he declared solemnly in the mortgage that the vessel was free of all incumbrances (see note 4, supra). He began the relationship of mortgagor-mortgagee with the rawest of deception if not flagrant misrepresentation. And whether he did, as claimed, personally get out of Winsen (see note 5, supra) he knew for Winson, the supposed lienor, that the vessel was mortgaged and that Winsen, the mortgagor and still the owner, had an implied obligation to pay debts which would materialize into liens, but that Winsen was not doing so. And all of this knowledge — gained (i) during the time he was admittedly active in Winsen and (ii) thereafter in his direction of Winson — became doubly positive when (iii) Winson in 1968 became the owner by the mysterious sale of the barge from Winsen to Winson. Although Winson "purchased" the vessel subject to the mortgage, which put on Winson the obligation to pay the mortgage debt, all of its actions were taken to eliminate the mortgagee's interests altogether.
 
 B. Duty to Prevent Waste
 
 17
 Execution of the mortgage made Winsen the mortgagor in possession of the mortgaged property. This placed the burden upon mortgagor Winsen to protect the mortgagee's security interest in the collateral[13] — protection against incumbrance by ranking subsequent liens and, in this instance, certainly against the further accretion of substantial amounts for claims having presumably the status of a maritime lien. When Winson — with full awareness — purchased the barge subject to the mortgage obligation it was undoubtedly exposed to liability for waste since the mortgagee's rights are continuous and the security follows the property until the debt is discharged, 59 C.J.S. Mortgages § 211. The mortgagee was entitled to have the security unimpaired not only by Winsen, but by its vendees as well. 59 C.J.S. Mortgages § 334.
 
 
 18
 The record compels the conclusion that Brown's actions on behalf of Winsen at the beginning and of Winson at the end — in his failure to take reasonable measures to protect the security interest or for that matter even to advise the mortgagee that the barge was idle and "eating its head off" — amounted to culpable waste. The concept of waste is equitable, and it would be unconscionable to allow the apparent superiority of the maritime liens to be used as an instrument of rewarding the mortgagor for the very consequences of the mortgagor's breach of duty.
 
 
 19
 We need not determine whether this is the case to pierce the corporate veil or to regard this all as a slick scheme and sham.[14] For seeking to intervene in a pending libel in rem, and more so, to set aside a default decree or a Marshal's sale under it, the door is not opened by some peremptory knock, but by the "gentle wand of equity". United States v. Maryland Casualty Company, 5 Cir., 1956, 235 F.2d 50, 53; see especially, Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Company, 5 Cir., 1962, 303 F.2d 692, 698, 1962 A.M.C. 1710, 1718.
 
 
 20
 A maritime lien has great prestige. But it is not an instrument of wrong. Against the positive mortgage lien known to Winsen, Winson, and the ubiquitous Brown to exist and to be in default the supposed maritime lienor may not demand that the seagoing chancellor become the engine of unfairness. See Ardell Marine Corp. v. The Mars, D.C. N.Y.1958, 163 F.Supp. 691.
 
 
 21
 As the epilogue to this section and the prologue to the next one this is the case of inequitable supplication.
 
 C. Laches
 
 22
 Whatever doubts there might be up to this point the lienor's judgment strands on laches. The mortgagee pleaded the statute of limitations as an affirmative defense to the asserted maritime lien. This encompassed as well the equitable doctrine of laches.
 
 
 23
 Laches is a flexible measure of the time within which a claim in admiralty must be asserted. Gardner v. Panama RR, 1951, 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31; McMahon v. Pan American World Airways, Inc., 5 Cir., 1962, 297 F.2d 268. The two important constituent elements are [i] an unreasonable delay by one party in the assertion of his remedy; and [ii] prejudice to another as a result of the delay. Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co., 5 Cir., 1958, 261 F.2d 861, 1959 A.M.C. 148; Morales v. Moore-McCormack Lines, Inc., 5 Cir., 1953, 208 F.2d 218; Akers v. State Marine Lines, Inc., 5 Cir., 1965, 344 F.2d 217. The crucial question is whether it would be inequitable because of the delay to enforce the claim, Czaplicki v. M/V "SS Hoegh Silvercloud", 1955, 351 U.S. 525, 76 S.Ct. 946, 100 L.Ed. 1387, the answer to which will depend upon the particular circumstances of the individual case. Young v. The Key City, 1872, 14 Wall. 653, 81 U.S. 653, 20 L.Ed. 896.[15]
 
 
 24
 In the long history of the application of laches in admiralty, including lien-priority contests as our own,[16] none is more compelling in terms of equities than this case.
 
 
 25
 The maritime lien successfully maintained below as prior to the mortgage expressly includes wharfage charges from October 1, 1964 to May 1, 1965 and this despite the express warranty that the mortgaged vessel was free of encumbrances. What started in commercial iniquity continued in inequity. Not until February 1968 — then 41 months after the lien assertedly began to accrue — was there even a demonstrable indication of a debt, its nature, basis or duration. No-where during this extended period did the lienor attempt to give even minimal notice to the mortgagee although, through the ubiquitous Brown, Winsen, Winson, and Caribbean knew of the existence of the mortgage and the fact that it must be in at least substantial default,[17] so much so that Winson's 1968 "purchase" of the barge was expressly subject to the mortgage. More so, failure to give minimal notice — and worse — allowing the charges to accumulate was a positive breach of duty to the mortgagee by the mortgagor Winsen and the subject-to-mortgagor Winson after purchase — a fact known to Winson as supposed lienor through Brown's radar. The mortgagee presumably knew of the non-payment of the mortgage debt, but from the combination of initial iniquitous deception and continued silence, it had no reason to know or even suspect that at the hands of the mortgagor, its leading figure and an assortment of closely related satellites, the mortgagee's reliance on the vessel as the source of ultimate satisfaction of the mortgage debt was itself being scuttled in the high name of maritime liens of prior rank.
 
 
 26
 With awareness of the mortgage the lienor had the minimum burden of initiating proceedings to judicially enforce the maritime lien within a reasonable time. As an alternative, the lienor could have likely added extended life to the lien by giving some character of notice. But it did neither. Assertion of the maritime lien by judicial proceedings, and certainly by notice, would have afforded the mortgagee the opportunity to determine what course of action it would take — (i) foreclose its mortgage lien without more (subject then to timely asserted maritime liens), (ii) let the "horse eat its head off", or (iii) some in between course.
 
 
 27
 But from long continued inaction by or silence of the lienor the mortgagee had no need to institute foreclosure proceedings. See 46 U.S.C.A. § 922. Thus the injury to the mortgagee was acute and, more serious, continuous. In this respect the circumstances of the case distinguish it markedly from the ordinary case in which antecedent delay in asserting liens would not cut off by laches assertion of a lien for the charges accruing independently later on. Hence a lien asserted for, say, the last year (February 1967-1968) is not saved by the proceeding filed in February 1968. For the injury to the mortgagee had become cumulatively worse as each month and year went by. The time that equity called either for seasonable judicial proceedings or minimal notice to the mortgagee was in the early stages. This could not be cured by instituting litigation for subsequent periods, no matter how promptly initiated.
 
 
 28
 This approach likewise eliminates any problem in fixing the period. Whether, as some cases have indicated a 12 month period is the maximum,[18] or from others it is a question of the total circumstances and intervening equities,[19] the filing here — September 1968 — was far too tardy. The lien fails in competition with the mortgage because of (i) delay for which (ii) there was no possible excuse, and (iii) acute, continuing harm to an innocent party.
 
 
 29
 Winson's difficulties were not eased by the assignment to Caribbean who took the assignment with all of its built-in deficiencies. See Maryland Casualty Co. v. Dulaney Lumber Co., 5 Cir., 1928, 23 F.2d 378, cert. denied, Bank of Ruleville v. Maryland Casualty Co., 1928, 277 U.S. 598, 48 S.Ct. 560, 72 L.Ed. 1007; 6 C.J.S. Assignments § 82. What Winson in good equity could not assert is equally foreclosed to Caribbean. Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Company, supra.
 
 
 30
 The upshot is that Winson's-Caribbean's claim for wharfage and repairs, whatever its status as a maritime lien against the vessel in view of the relationship of the parties, is barred by laches as against the mortgage claim of the mortgagee. To the full extent of the mortgage debt, with interest, costs and any other incidents for costs, fees, etc., the asserted maritime liens must give way to the mortgage. On remand the District Court shall enter a decree accordingly.
 
 
 31
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 The Nassau Branch of Barclay's Bank D.C.O. in 1965 acquired a mortgage on the steel barge "Star 800". It transferred this mortgage to Florida Bahamas Lines, Ltd. in 1968 for valuable consideration. Thus both parties will be referred to singularly as the mortgagee
 
 
 [2]
 Winsen, Ltd. (Winsen), a Bahamian corporation owned the barge "Star 800"
 Winson, Inc. (Winson), a Florida corporation, had been organized by Brown prior to 1964. Winson's only business was renting wharf space at its dock located on the Miami River in Miami, Florida. Although it is running an allegedly active business Winson has no payroll.
 Caribbean Tanker Service, Inc. (Caribbean), a Florida corporation, involved solely in ship and service repairs, rented office space from Winson at the immediate proximity of Winson's dock.
 
 
 [3]
 A dissection of the subcutaneous structure of Winsen, Winson, and Caribbean discloses that Brown at one time relevant to the occurrences giving rise to this litigation, concurrently held the majority of the offices in all three corporations, had plenary power to conduct their business affairs, did so, and held the majority, or a substantial portion of all their stock. The following chart shows Brown's relationship with these allegedly separate corporations
 October 1964-February 1968
Offices Held by Brown
 (i) Winsen, Ltd. ..... President
 Treasurer
 Chairman of
 the Board
 (ii) Winson, Inc. ..... President
 (iii) Caribbean Tanker
 Service, Inc. .... *President
 Vice-President
 Secretary
 
 
 *
 The credulity of Brown's testimony is seriously impaired by a number of salient conflicts in it. In this proceeding he testified that he had never owned more than 46 2/3% of the stock in Caribbean, yet in an earlier, related case he testified that he had owned 60% of the stock in that corporation. In another instance he testified that his tenure as president of Caribbean terminated on March 1, 1968 following which time he acted only in the capacity of Vice-President and Secretary. Counsel for mortgagee immediately impeached this testimony by introducing in evidence the latest tax return filed by Caribbean. It bears the signature of Joseph S. Brown, which he identified as his own, and the date of October 9, 1968, irrefutably showing that Brown was indeed acting in the official capacity of President of Caribbean 7 months later than he stated under oath
 
 
 [4]
 The mortgage is on form No. 11a "mortgage (to secure principal sum and interest)" prescribed by the Commissioner of Excise and Customs (1960). The contents of the mortgage reveal that it is structured upon the ownership of shares in the vessel and that it extends to all of the existing shares in the barge owned by the mortgagor. The mortgage contains a convenant by mortgagor Winsen, that the mortgagor has the power to mortgage its shares in the vessel and that the shares in the vessel "are free from incumbrances"
 
 
 [5]
 There is no documentary evidence to support this fact. The only evidence to this effect is the following testimony elicited from Brown on cross-examination
 "Q. What is your relation with Winsen, LTD., a Bahamian corporation?
 A. Are you referring to today?
 Q. Today, we will start with.
 A. We are just good friends today, your Honor.
 Q. Previous to today, were you ever an officer of Winsen, LTD?
 A. Yes, sir, I was.
 Q. What was your position or capacity?
 A. I was president, chairman of the board and treasurer.
 Q. Were you not president for a number of years?
 A. Yes, sir.
 Q. How many years, precisely?
 A. Approximately two.
 Q. What years would that encompass?
 A. June, 1963 to May, 1965.
 Q. During the time you were president of that corporation, did you execute a mortgage in favor of Barclay's Bank on the barge "STAR 800"?
 A. I did.
 * * * * *
 Q. During the time you were president of the corporation, do you know if these mortgages were discharged?
 A. The first mortgage was discharged.
 * * * * *
 Q. And referring to the second mortgage, dated March of 1965, has that mortgage in the amount of 15,000 Pounds ever been discharged?
 A. * * * Not to my knowledge. * * *"
 
 
 [6]
 The trial Court allowed a prior maritime lien for this sum made up of the items stated in the separate invoices (Items (10) and (11) were subsequent to February 28):
 Dockage

 Item
 (1) October 1, 1964-December 31, 1964 $ 552.00
 (2) January 1, 1965-December 31, 1965 2,190.00
 (3) January 1, 1966-December 31, 1966 2,190.00
 (4) January 1, 1967-December 31, 1967 2,190.00
 (5) January 1, 1968-February 28, 1968 354.00
 _________
 (6) Sub-total $7,476.00

 Pumping and Maintenance
 (7) June, July, August 1967 480.00
 (8) Sept., Oct., Nov., Dec. 1967 720.00
 (9) Jan., Feb. 1968 240.00
 (10) March, April, May 1968 420.00
 (11) June, July, August 1968 (and welding) 559.00
 _______
 (12) Sub-total $2,419.00
 _________
 (13) Total $9,895.00
 
 
 [7]
 Brown testified that at the time of the assignment Winsonmight have been indebted to Caribbean, but if so, the amount of the debt was very small.
 
 
 [8]
 Whatever the technical corporate structures Winson and Caribbean were not strangers: [i] both Winson and Caribbean used the exact same office; [ii] they both used the exact same telephone and telephone number; [iii] Brown was the acting business officer for both, with full authority to write all checks; [iv] the evidence of the debt owned by these different corporations (the invoices) and involved in this litigation has been physically located throughout at the offices of Winson and Caribbean; and [v] Winson leased riverfront property on which its dock was located, the rental fee amounting to $50.00 per year. Caribbean paid an undisclosed but nominal sum to Winson that was sufficient to cover this rental. Brown, not one not to "guild the lily", even procured a single cable code address — "CARATL", "Telex: 5-1786, Miami", "Answer Back: CARAT MIA" — that was identical for both Winson and Caribbean, as reflected on the printed invoices of Winson
 
 
 [9]
 Counsel for mortgagee subpoenaed the officer who is in charge of the Registry to appear and to produce the registration document showing title to the barge. Mr. Riggs appeared and certified that the registration documents showing the title, the description, and the transferor and transferee, etc., had been turned over to Brown, at his own request, six months preceding the trial, and that Brown still had this title registration in his possession. Unfortunately he did not have them with him in the courtroom and on a hyper-technical objection he had successfully avoided appearance for a pretrial deposition under subpoena duces tecum. Brown, running true to form, did not bring it to trial with him. Although our powers are considerably shorn by F.R.Civ.P. 52(a) on fact findings, we too are a Court of Admiralty and in an amphibious, equitable proceeding such practices rightfully entitle us to much scepticism and a close scrutiny of all
 
 
 [10]
 Although the exact charge is not clear, Wolf brought a criminal action against Brown for taking $8,900.00 and not giving the barge free and clear as promised. Oddly enough Wolf's lawyer now enters the lists in this case as co-counsel for the Brown interests
 
 
 [11]
 While this latest transaction was reaching a climax, Brown made arrangements to sell the "Star 800" to a Mr. Nikash & Fong-Yee, promising him that if the barge could be delivered, it would be delivered free and clear of all claims and liens. A down payment was placed in escrow, but the record subsequently becomes silent on the outcome of the transaction other than Brown's inability to deliver the barge free and clear of all liens
 
 
 [12]
 By not complying with Rule 6, subd. D Carribean kept its suit on the maritime lien from being re-assigned on the Calendar and brought to the attention of the mortgagee. Rules 6, subd. C and 6, subd. D state:
 "Rule 6C. Similar. Whenever an action or proceeding is filed in this court which invoices subject matter which is a material part of the subject matter of another action or proceeding then pending before this Court, or for other reasons the disposition thereof would appear to entail unnecessary duplication of judicial labor if heard by a different judge, the judges involved shall determine whether the newly filed action or proceeding should be transferred to the judge to whom the low numbered action or proceeding is assigned.
 Rule 6D. Duty Of Attorneys. It shall be the continuing duty of the attorneys of record in every action or proceeding to bring promptly to the attention of the Court and opposing counsel the existence of other actions or proceedings as described in paragraphs A, B, and C hereof, as well as the existence of any such similar actions or proceedings then pending before another court or administrative agency. Such notice shall be given by filing with the court and serving on opposing counsel a `Notice of Pendency of Other Actions,' containing a list and description thereof sufficient for identification."
 
 
 [13]
 It is rudimentary under the lien theory of mortgages that the mortgagor-property owner retains possession of the mortgaged article, and the mortgagee receives a security interest in the mortgaged property that serves as collateral for the debt. Osborne on Mortgages, § 127 (2nd ed. 1970); II Glenn On Mortgages, § 196 (1st ed. 1943). The mortgage lien is the right to resort to the security interest in order to obtain payment for the debt. 59 C.J.S. Mortgages § 208. While the mortgagor in possession may do such acts with the property as are proper and reasonable in the course of normal business transactions, Osborne, § 128, he must nevertheless take all reasonable steps to protect the collateral that secures his debt, Restatement of Securities, § 132; II Glenn, § 195.1; 59 C.J.S. Mortgages § 294, so that a course of conduct which imperils the safety of the security, such asmismanagement, is considered to be waste. II Glenn on Mortgages, § 201.
 Waste has been recognized as anything which tends to destroy the mortgagee's security. 59 C.J.S. Mortgages § 334. This may be the result of the mortgagee's affirmative action, or his omission. 59 C.J.S. Mortgages § 294. A party will be held liable for waste of the security interest if he can be charged with knowledge of the mortgage, and that his acts would impair the mortgagee's security. Osborne, § 129.
 
 
 [14]
 In Findley v. Lanasa,supra, a case involving a maritime lien for cash advances made to a master for use in the payment of the crew's wages, and a lot of plain and fancy footwork as well, this Court had cause to state: "There is a lot of family on both sides of this transaction involving the good ship S/S Josephine Lanasa. * * * The advance being made by one brother to the master in the employ of the other for the purpose of defraying expenses for charterer's account gave the Court considerable pause. This general circumstance of suspicion was enhanced by other factors." 276 F.2d at 908. The Court, elaborating such "other factors" "as makes the entire transaction subject to the sharpest scrutiny", 276 F.2d at 909, found existent a scheme that was violative of the "general maritime law".
 
 
 [15]
 This case, written in 1872, states the underlying theory including the element of intervening equities:
 "[N]o arbitrary or fixed period of time has been, or will be, established as an inflexible rule, but that the delay which will defeat such a suit must in every case depend upon the peculiar equitable circumstances of that case."
 The Court went on to say:
 "that where the lien is to be enforced to the detriment of a purchaser for value, without notice of the lien, the defense will be held valid under shorter time, and a more rigid scrutiny of the circumstances of the delay [will be given]." (emphasis ours)
 
 
 [16]
 The Mendotta II, 1935, D.C.N.Y., 13 F.Supp. 1019; National Shawmut Bank of Boston v. The Winthrop, The Dorchester, The Quincy, D.C.Mass., 1955, 134 F. Supp. 370; McMillan Welding & Mach. Works v. General Towing Co., D.C.La., 1965, 247 F.Supp. 402; Heller & Co., v. M/V Mr. Ed, D.C.La., 1967, 273 F.Supp. 926; Gulf Coast Marine Ways, Inc. v. The J. R. Hardee, S.D.Tex., 1952, 107 F.Supp. 379; The Hughes Line, S.D. N.Y.1928, 29 F.2d 629
 
 
 [17]
 Except for a very brief period of just a few weeks there is no indication that the barge ever left her berth — a fact borne out by the 1968 invoices, note 6,supra. With no record showing of any independent resources in Winsen, ability to pay off the mortgage debt depended on the vessel's earnings which were virtually nonexistent.
 
 
 [18]
 See, e. g., The Marsodak, 4 Cir., 1938, 94 F.2d 339; Patterson Shrimp Co. v. The O/S Freedom, S.D.Tex., 1962, 211 F.Supp. 852
 
 
 [19]
 Young v. Key City, note 15,supra; Gulf Coast Marine Ways, Inc. v. The J. R. Hardee, S.D.Tex., 1962, 107 F.Supp. 379; The Hughes Line, S.D.N.Y., 1928, 29 F.2d 629.