**HORNBECK OFFSHORE OPERATORS, INC., Plaintiff,**

v.

**OCEAN LINE OF BERMUDA, INC. and The United States of America, Defendants.**

No. 2:93cv145.

United States District Court, E.D. Virginia, Norfolk Division.

April 6, 1994.

James Long Chapman, IV and Guilford D. Ware, Crenshaw, Ware & Martin, Norfolk, VA, for plaintiff.

Anita Kay Henry, U.S. Attorney's Office, Norfolk, VA, and David V. Hutchinson and Mee Lon Lam, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for defendants.

## OPINION AND FINAL ORDER

DOUMAR, District Judge.

### I. *Introduction and Procedural Background*

This suit was brought by Hornbeck Offshore Operators, Inc., ("Hornbeck") against Ocean Line of Bermuda, Inc. ("OLB") in connection with charter hire owed by OLB to Hornbeck pursuant to a charter party for the M/V H.O.S. BOLD VENTURE (the "BOLD VENURE"). Hornbeck sought an *in rem* claim against the United States in the amount of $115,683 [1] together with interest, costs and attorney's fees pursuant to a maritime lien on subfreights created by the charter party and owed by the United States to OLB.

The United States was not a party to the charter. OLB used the vessel to perform a government contract with the United States. Hornbeck was not a party to the government contract. Eventually, OLB defaulted under both the government contract and the charter party. Hornbeck claims a maritime lien against moneys owed to Hornbeck by the United States for unpaid freight carried aboard the BOLD VENTURE.

The United States denies liability to Hornbeck and alternatively claims a setoff for

---

1. By stipulation the amount was later agreed to be $117,438.24.

moneys which it alleges that OLB owed to the United States. Because the United States' purported setoff is of an amount greater than that which Hornbeck alleges the United States owes to OLB, the United States contends that Hornbeck cannot recover anything from the United States in this action. Alternatively, the Government contends that Hornbeck's lien is barred by the Anti–Assignments Act.

OLB is in default. The United States and Hornbeck have entered a stipulation to all of the facts, submitted memoranda and fully argued the matter. This Court concludes for the reasons set forth herein that the United States is not liable to Hornbeck and judgment is therefore entered for the defendant United States of America.

## II. *Factual Background*

On September 9, 1991, the Department of the Navy Military Sealift Command ("MSC") awarded a requirements contract to OLB for ocean transportation services for the carriage of less-than-shipload lots of Department of Defense cargo between Norfolk, Virginia, and the Naval Air Station, Bermuda ("NAS Bermuda"). The contract was for services from October 1, 1991, through September 30, 1993. For the two year period prior to this contract, OLB had performed the same services pursuant to the same terms and conditions.

Under the contract, the United States regularly shipped containerized and breakbulk cargo between Norfolk and NAS Bermuda. The contract was on "liner terms" and OLB was responsible for all costs and services from the time the cargo was receipted for by OLB at the port of loading to the time the cargo was made available to the consignee at the port of discharge, including costs of loading and unloading. Under the contract, OLB had the option of utilizing any berthing facili-

ty in Hampton Roads; it used facilities operated by MSC.

The parties agree that during the contract period, the standard course of dealing between OLB and MSC regarding dockage, wharfage, and stevedoring services performed was for the Government to invoice OLB for reimbursement of the costs of these services in accordance with the tariff rates provided to OLB by letter. These services were never requested or authorized by plaintiff Hornbeck.

The Government invoiced OLB for dockage, wharfage and stevedoring charges incurred during the period from October 1, 1989 through February 6, 1993. Beginning in October, 1990, OLB started making only sporadic payments and by February, 1991, quit paying these charges altogether. At the end of OLB's 1989–1991 contract, unpaid invoices for stevedoring, dockage and wharfage totalled $113,937.25. From October 1990 through February 6, 1993, the unpaid stevedoring, dockage and wharfage charges totalled $416,954.56. The Government did not pursue these delinquencies until after it terminated OLB's contract for default on February 6, 1993, and Hornbeck had no notice of the delinquencies at anytime before the termination.[2] OLB has never paid the MSC invoices.

The vessel utilized by OLB for performance under the contract was the BOLD VENTURE, pursuant to the charter party entered into between Hornbeck and OLB. On November 30, 1992, OLB also stopped paying Hornbeck charterhire. Total outstanding unpaid charterhire for the period December 1, 1992 through February 5, 1993, is $158,955.00, plus interest at 18% annum. Hornbeck's agent, John Meyer, notified Laura Quarles of MSC on February 5, 1993 of Hornbeck's claim of lien on subfreights under the terms of paragraph sixteen of the charter.[3] Meyer requested that the United

---

**2.** By way of additional facts, the parties have stipulated that Hornbeck's witnesses would testify that, had they known of OLB's unpaid services charges owed to the United States, Hornbeck would have terminated its 1989 charter with OLB and would not have rechartered it in 1991. The United States does not deny the substance of the testimony, but disputes its relevance. There

was no showing of any duty on the part of MSC to notify Hornbeck of its claims.

**3.** Paragraph 16 of the charter party reads:
 The Owners shall have a lien upon all cargoes and all sub-freights for any amounts due under this Charter, including general average contributions, and the Charterers shall have a lien on the Vessel for all monies paid in ad-

States pay all outstanding freight moneys owed to OLB directly to Hornbeck.

Under OLB's contract with the United States, freight was earned by OLB for each individual shipment upon delivery of the cargo to the ultimate destination. Freight was then paid by the United States upon receipt of a properly certified invoice that such services were performed. As of February 5, 1993, when it was placed on notice of Hornbeck's claim of maritime lien on subfreights, the United States owed $117,438.24 to OLB for unpaid freight for the last four voyages completed by OLB. The Government still retains the unpaid freight.

On February 6, 1993, MSC issued written notice to OLB of termination for default. Under the default clause of the contract, MSC then immediately chartered the BOLD VENTURE directly from Hornbeck. Under the terms of MSC's second contract with OLB, the Government asserted a claim against OLB for damage to reefer cargo on a March 1990 voyage which has been settled for $11,524.39 but which remains unpaid. In addition, during a January 1992 voyage two empty containers went overboard, in the process damaging a third container of solar panels. Under the provisions of the Carriage of Goods by Sea Act clause under the contract, the loss of the panels is valued at $34,259.00.

Hornbeck contends that OLB is indebted to Hornbeck for breach of the charter in the amount of $158,955.00, plus interest, costs and attorney's fees. It claims that under the charter party it may assert and has asserted a maritime lien on all cargoes and all subfreights for any amounts due under the charter. It thereby claims a maritime lien on the $117,438.24 in subfreights which the United States owes to OLB, and asserts the claim against the United States pursuant to 46 U.S.C.App. § 742. The setoffs claimed by

the United States through MSC far exceed this amount.

Hornbeck contends that its maritime lien against unpaid subfreights can not be set-off by claims held by MSC against OLB. Alternatively, Hornbeck contends that even if set-off does apply against Hornbeck's maritime lien on subfreights, none of the cargo damage claims for which the United States seeks a setoff arise out of or are in any way related to the voyages for which the United States has withheld freight payments to OLB, and therefore can not set-off Hornbeck's maritime lien. With some exceptions from January and February 1993, amounting to approximately $14,400, Hornbeck also contends that none of the services for which OLB has not paid and for which the United States seeks a setoff arise out of or are in any way related to the four voyages for which the United States has withheld freight payments. Finally, Hornbeck contends it had no notice of OLB's failure to pay for dockside services, and it claims that the United States is barred by laches from setting-off its charges as well as its damage claims and excess reprocurement costs.

The Government acknowledges that it has withheld payment in the amount of $117,-438.24 in unpaid freight charges for services performed by OLB on voyages between December 24, 1992 and January 26, 1993. However, it claims that Hornbeck's rights against it are by nature an assignment which, like any rights which OLB would have against the Government, is subject to setoff by all claims of the Government against OLB. Specifically, the Government claims it is entitled to set-off OLB's unpaid charges owed to MSC for pay port services in the amount of $416,954.56. The United States also asserts a claim for damage to reefer cargo on a March 1990 voyage which has been settled for $11,524.39 but which remains unpaid, and $34,259.00 in damages to cargo under the

vance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel (See Cls. 41).

Upon Charterers' failure to timely pay charter hire, Owners may elect to present a copy of

this Charter to M.S.C. and request that M.S.C. make payments of past due, current and future charter hire due hereunder direct to Owners, Charterers hereby agreeing to such arrangement. Charterers further agree that Owners may have a maritime lien on current and future payments by M.S.C. to Charterers for past due hire.

Carriage of Goods by Seas Act rules incorporated into the contract. The United States also asserts that it is entitled to reprocurement costs in the amount of $3,226.82 as a result of the default of OLB. In sum, the United States claims a setoff greater than any amount alleged due to Hornbeck, and therefore contends Hornbeck is not entitled to recover anything from the United States.

OLB did not respond to the complaint. Hornbeck requested that a default be noted on April 28, 1993.

The parties thus presented three triable issues for final arguments. First, whether Hornbeck has a perfected maritime lien against the subfreights which remain unpaid by the United States to OLB. Second, if Hornbeck has a perfected maritime lien, whether the lien should be set-off by the amounts OLB owes the United States under the contract for port services, cargo damage, and reprocurement costs. And third, if the perfected maritime lien exists and is not subject to a setoff, whether the lien is void as an assignment of a claim against the United States in violation of the Anti–Assignments Act.[4]

## III. *Discussion*

### A. *Owner's Lien on Subfreights*

The first issue before the Court is whether Hornbeck holds a maritime lien against unpaid subfreights earned by OLB for carriage of Government cargo.

■ A vessel owner may obtain a lien against cargo and unpaid subfreights[5] for his charterer's breach of the charter party. The vessel owner's lien is derivative of the rights of the charterer: the charterer's lien against cargo for unpaid freight arises as a matter of maritime law; the charter party may create in the vessel owner an equitable lien which entitles the vessel owner to assert the charterer's rights and remedies against the cargo owner for unpaid freights. *Larsen v. 150 Bales of Sisal Grass*, 147 F. 783, 784–85

(S.D.Ala.1906); *American Steel Barge Co. v. Chesapeake & O. Coal Co.*, 115 F. 669, 53 C.C.A. 301 (1st Cir.1902).

■ The vessel owner's lien on subfreights may be created only by a provision in the charter party. Gilmore & Black, The Law of Admiralty at 631–32 n. 103 (2d Ed. 1975) (citations omitted); 2 Benedict on Admiralty § 45 (6th ed. 1991); *Biehl & Co., Inc. v. Apollonia Holding, Inc.*, 693 F.Supp. 457, 465 (E.D.La.1988). While a lien against cargo is lost by unconditional delivery to the consignee, a vessel owner's lien on subfreights is not possessory, so the shipowner can enforce his lien even after the cargo has been delivered. Gilmore & Black at 631.

■ To be enforceable against a third party cargo owner, the vessel owner's lien must be perfected. The vessel owner's lien on subfreights is perfected when the bill of lading issued to the cargo owner gives notice of the lien or the cargo owner otherwise receives actual notice of the vessel owner's lien. Gilmore & Black at 631–32 n. 103 (citations omitted). The lien is only discharged when the freight has been paid to the vessel owner or to the charterer without notice of the lien. *Biehl*, 693 F.Supp. at 466.

Paragraph 16 of the charter party contained a clause granting Hornbeck a lien on subfreights owned to OLB for unpaid charter hire. Thus, Hornbeck's maritime lien would have arisen as of the date of the charter party. *See American Steel Barge*, 115 F. at 673. This lien would have become perfected against the United States when the United States received actual notice of the lien on February 5, 1993. Therefore, under hornbook admiralty law, as of February 5, 1993, Hornbeck ostensibly held a lien for up to $117,438.24 for unpaid subfreights owed by the United States to OLB.

The United States asserts several defenses to Hornbeck's recovery. The United States first contends that Hornbeck's lien amounts

---

4. The United States also claims that Hornbeck's lien is voided by the contract entered into between the United States and OLB. However, as discussed *infra*, this Court finds that the contract language merely begs the question of whether the Act bars Hornbeck's lien. Accordingly, the two issues are considered together in the Court's analysis of the Act.

5. Subfreights are the hire under a subcharter as well as bill of lading freight payable by shippers and consignees.

to an assignment, is derivative of OLB's rights against the United States, and therefore is subject to setoff by the amount of OLB's liability to the United States for unpaid charges owned to MSC. Alternatively, the United States claims that Hornbeck's lien is barred by the Anti–Assignments Act.

### B. United States' Right to Setoff

#### 1. Applying Setoff in Admiralty Cases

■ It is well established that the vessel owner's maritime lien on subfreights is subject to the cargo owner's right to a setoff. *American Steel Barge,* 115 F. at 677–78 (citing *Hutchinson v. Le Roy,* 113 F. 202 (1st Cir.1902)).

However, Hornbeck contends that under admiralty law, claims arising out of different transactions may not be set-off against each other. *See United States v. Isthmian Steamship Co.,* 359 U.S. 314, 320–21, 79 S.Ct. 857, 861–62, 3 L.Ed.2d 845 (1959). The *Isthmian* Court held that Admiralty Rule 50 barred a setoff of claims arising out of different transactions. *Id.* The Court noted that Fed.R.Civ.P. 13(b) adopted a "more flexible" approach by allowing parties to set-off claims not arising out of the same transaction. *Isthmian,* 359 U.S. at 322, 79 S.Ct. at 862.

■ The Admiralty Rules were merged with the Federal Rules of Civil Procedure in 1966, with the following consequence:

> After the *Isthmian* decision, in 1966 the Admiralty Rules of 1920 were rescinded and the Civil Rules were extended to Admiralty. Although certain Civil Rules were expressly amended to preserve features of the former admiralty practice, Rule 13 was not amended, and it is not inconsistent with any of the Supplemental Rules for Certain Admiralty and Maritime Claims. Thus by the rule making that accomplished unification in 1966, Rule 13 in its entirety, including its provisions for permissive counterclaims, applies to the civil action whether or not it includes maritime claims.

3 Moore's Federal Practice ¶ 13.02 at 13–20 n. 23 (2d Ed.1994). Thus, "the more flexible" Fed.R.Civ.P. 13(b) approach to setoff is now the law in admiralty cases, and claims arising from different transactions may be set-off against each other. *Id.* at ¶ 13.02 at 13–20 n. 23, ¶ 13.27 at 13–159 n. 7 (2d Ed.1994). *See United States v. M/V Pitcairn,* 272 F.Supp. 518, 519 (E.D.La.1967).

The Government asserts its right to setoff pursuant to the. federal setoff statute, 31 U.S.C. § 3728 [6] and under the common law right to setoff. This Court finds that, under the setoff statute, the United States may setoff Hornbeck's lien with any and all amounts owed to the United States by OLB.

■ Under the provisions of 31 U.S.C. § 3728, the United States may generally plead setoff of sums owed to it by a plaintiff. Although the United States is seeking to setoff amounts owed by OLB, another defendant in this action, the setoff statute nevertheless applies. An assignee of a judgment against the United States takes it subject to the right of the Government to a setoff pursuant to the statute. *United States v. Transocean Air Lines,* 386 F.2d 79, 82 (5th Cir.), *cert. denied,* 389 U.S. 1047, 88 S.Ct. 784, 19 L.Ed.2d 839 (1967); *Teller v. United States,* 113 F. 463 (8th Cir.1901). In *Transocean Air Lines,* a debtor, whose attorneys were to be paid on a contingency basis, settled his claim against United States. The court held that because the United States' setoff ex-

---

6. 31 U.S.C. § 3727 provides:
 Setoff against judgment
 (a) The Comptroller General shall withhold paying that part of a judgment against the United States Government presented to the Comptroller General that is equal to a debt the plaintiff owes the Government.
 (b) The Comptroller General shall—
 (1) discharge the debt if the plaintiff agrees to the setoff and discharges a part of the judgment equal to the debt; or
 (2)(A) withhold payment of an additional amount the Comptroller General decides will cover legal costs of bringing a civil action for the debt if the plaintiff denies the debt or does not agree to the setoff; and
 (B) have a civil action brought if one has not already been brought.
 (c) If the Government loses a civil action to recover a debt or recovers less than the amount the Comptroller General withholds under this section, the Comptroller General shall pay the plaintiff the balance and interest of 6 percent for the time the money is withheld.

ceeded the amount of the settlement, the debtor's attorneys could not recover any fees from the United States. 386 F.2d at 82. In *Teller*, the United States sought to protect its right to a setoff against a judgment plaintiff's claim by seeking an injunction to prevent the plaintiff from assigning or transferring his judgment. The court found it unnecessary to grant the injunction, as the government's right to a setoff would be valid against any assignee or transferee of the plaintiff's judgment. 113 F. at 465.

■ Similarly, the Court finds that the government may set-off Hornbeck's lien for unpaid subfreights with OLB's outstanding indebtedness to the Government, whether or not that indebtedness arises out of the transaction giving rise to Hornbeck's lien.

### 2. Laches and Equitable Subordination

Hornbeck contends that, even if the Government has a right to a setoff, the Government's claims are barred by the equitable principles of laches and subordination. The statute which provides for setoff, 31 U.S.C. § 3728, contains no specific provision governing when setoff must be pleaded.

■ "Laches is a flexible measure of the time within which a claim in admiralty must be asserted." *Florida Bahamas Lines v. Steel Barge "Star 800" of Nassau*, 433 F.2d 1243, 1250 (5th Cir.1970) (citations omitted). The elements necessary for the doctrine of laches to apply are unreasonable delay by a party in asserting his remedy and prejudice to another as a result of the delay. *Id.* (citations omitted). In *Florida Bahamas Lines*, the court held that a lienor's failure to initiate proceedings or give any notice of its lien against a vessel for forty-one months prejudiced the mortgagee of the vessel (who had no notice of any encumbrances on the vessel) and warranted subordination of the lien to the mortgage. 433 F.2d at 1251–52.

Courts often state the general principle that the doctrine of laches may not be asserted against the United States. *See e.g., United States v. Summerlin*, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940); *E.E.O.C. v. American Nat. Bank*, 420 F.Supp. 181, 184 (E.D.Va.1976), *cert. denied*, 439 U.S. 876, 99 S.Ct. 213, 58 L.Ed.2d 190. However, the case law is unsettled on this issue and the Court finds that the Government may be held to a standard of reasonable delay depending on the circumstances of the particular case. *American Nat. Bank*, 420 F.Supp. at 184.

■ However, the Court does not find that the doctrine of laches should bar the Government's assertion of its setoff right in this case. The amount of time during which the Government was inactive in this case was substantially less than that involved in *Florida Bahamas Lines* (approximately 24–27 months as opposed to 41 months). Moreover, unlike *Florida Bahamas Lines*, the present case does not involve competing maritime liens. In the present case, the United States is not asserting a maritime lien, but is merely attempting to set-off the amount which OLB owes against the recovery sought by Hornbeck pursuant to its derivative rights as an assignee. Accordingly, the Court does not find that fundamental fairness requires that the doctrine of laches be imputed in this case.

■ Additionally, Hornbeck contends that the Court should subordinate the Government's right of setoff. Three conditions are necessary to justify equitable subordination: (i) The setoff claimant must have engaged in some type of inequitable conduct, such as fraud, illegality, or breach of fiduciary duty; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with federal statutes. *See Custom Fuel Services v. Lombas Industries*, 805 F.2d 561, 566 (5th Cir.1986) (citations omitted). Assuming that the doctrine of equitable subordination is applicable to setoff situations, the Court finds no inequitable conduct on the part of the Government nor unfair advantage gained by the government in failing to assert its rights earlier. Moreover, the Court finds that subordinating the government's claim in this case would frustrate the federal setoff statute, 31 U.S.C. § 3728.

In sum, the Court finds that the United States is entitled to set-off Hornbeck's maritime lien with OLB's outstanding indebtedness to the Government, which the parties have stipulated to be $465,964.77. Based on the stipulated amounts of the parties' respective claims, the Court finds that the setoff will defeat any recovery by Hornbeck against the Government.

## C. *The Anti–Assignments Act*

In addition to finding that the United States should prevail in this action by virtue of its right to setoff, this Court would enter judgment for the United States because the Court would find that the Anti–Assignments Act would bar Hornbeck's claim.[7]

■ The Anti–Assignments Act provides that voluntary assignments of claims against the Government are void.[8] The Act was created to: (1) prevent the buying up of claims against the Government; (2) avoid multiple payment of claims; (3) make unnecessary the investigation of assignments; and (4) preserve Government defenses which the Government might have by way of setoff and counterclaim and which might not be available against an assignee. *See United States v. Shannon*, 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952); *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949). *See also Bernert Towboat Co. v. USS Chandler*, 666 F.Supp. 1454, 1460 (D.Or.1987) (citing *Kingsbury v. United States*, 563 F.2d 1019, 1024, 215 C.Cl. 136 (1977) (explaining the rationale for the cur-

rent Act)). The Anti–Assignments Act broadly encompasses derivative interests of all types:

> The statute ... embraces alike legal and equitable assignments, and strikes at every derivative interest, in whatever form required, and incapacitates every claimant to create an interest in the claim in any other than himself. It is not necessary that the interest transferred be absolute or vested in order to come within the statute; a contingent or conditional interest is sufficient and any consideration that will support a contract may be sufficient to bring the assignment within the prohibition.

6 Am.Jur.2d Assignments, § 71 (1963). If the lien is an assignment within the meaning of that statute, then it is null and void as against the United States unless the procedural requirements of the statute were met. 31 U.S.C. § 3727(b). Hornbeck contends that the Supreme Court has carved out exceptions to the Anti–Assignments Act where the assignment at issue poses no danger of fraud, double payment, or undue prejudice to the government.

■ The essential question is whether Hornbeck's lien on subfreights, which was created by the charter party, constitutes an assignment within the meaning of 31 U.S.C. § 3727. A maritime lien on subfreights is distinguishable from typical "land liens," and the Court therefore may not assess the relative value of a maritime lien merely by its label as a "lien." *See* Gilmore & Black at 589. As noted above, it is well established that a maritime lien on subfreights is a deriv-

---

7. The Government also argues that the contract itself bars the assignment of OLB's claim to Hornbeck. The contract entered into between OLB and the United States merely incorporates Fed.Acq.Reg. 48 C.F.R. 52.232–23, which the Government contends is a prohibition on assignments of claims under the contract. *See* Exhibit 20, p. 51. The Court finds that the regulation, and, therefore, the contract do nothing more than incorporate the prohibitions of the Anti–Assignments Act, 31 U.S.C. § 3727. Therefore, the government's contention that the contract or the regulation prohibits Hornbeck's lien as an assignment merely begs the question of whether Hornbeck's lien is barred by the Anti–Assignments Act.

8. 31 U.S.C. § 3727 reads, in relevant part:
 (a) In this section, "assignment" means—

(1) a transfer or assignment of any part of a claim against the United States Government or of an interesting the claim; or
 (2) the authorization to receive payment for any art of the claim.
 (b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

ative right which amounts to essentially an agreed assignment of the rights of the charterer in the unpaid freights. *See Larsen,* 147 F. at 784–85; *American Steel Barge,* 115 F. at 673; *Biehl,* 693 F.Supp. at 465; *Luckenbach Overseas Corp. v. S.S. Audrey J. Luckenbach,* 232 F.Supp. 572, 575 (S.D.N.Y.1963) (quoting *American Steel Barge,* 115 F. at 673). Indeed, as we have seen, the lien exists only by virtue of the agreement in paragraph 16 of the charter party between OLB and Hornbeck. Clearly this is a derivative assigned right.

Because the Government has the right to setoff in this case, it is not prejudiced. However, were the Court to find that OLB's transfer of its rights against the United States to Hornbeck eliminated the Government's right to setoff, the Court would find that the Government was prejudiced by the assignment and would find it necessary to apply the Anti–Assignments Act and void the assignment in this case.

 Hornbeck contends that the broad waiver of sovereign immunity granted by the Suits in Admiralty Act renders the Anti–Assignments Act inapplicable to admiralty cases. *See Ozanic v. United States,* 188 F.2d 228, 230–232 (2nd Cir.1951) (citing *Seaboard Fruit Co. v. United States,* 73 F.Supp. 730, 731–32 (S.D.N.Y.1946); *The WEST GRAMA,* 1924 A.M.C. 1444, 1445–46 (S.D.N.Y.1924)). In *Ozanic,* Judge Learned Hand stated, in *dicta,* that:

> [i]n the admiralty the assignee of a chose in action is recognized as the obligee and may sue in his own name, and it has twice been held that the Suits in Admiralty Act—particularly the repealing section—made inapplicable the Anti–Assignment Act. We do not, however, find it necessary to decide as to this reasoning and arguendo we shall assume that it is sound, because even so we think that [the appellant] ... cannot prevail (citations omitted).

*Ozanic,* 188 F.2d at 231. However, the most recent court to address the issue concluded that actions under the Suits in Admiralty Act were not exempt from the Anti–Assignment Act, and described the reasoning of the above-cited cases as "... questionable at best." *Bernert Towboat,* 666 F.Supp. at 1460

n. 3. This Court finds that actions under the Suits in Admiralty Act are not exempt from the Anti–Assignments Act.

 Thus, the Court finds that the Anti–Assignments Act would bar the assignment of OLB's claim against the Government to Hornbeck.

### III. *Conclusion*

The Court finding that Hornbeck's maritime lien (in the amount of $117,438.24) is subject to the right of the United States to set-off sums owed to it by OLB for port services ($416,954.56), cargo damage ($45,783.39) and reprocurement costs ($3,226.82), the Court finds that Hornbeck is not entitled to any recovery against the United States.

IT IS SO ORDERED.