BIEHL & CO., INC.

v.

APOLLONIA HOLDING, INC., Good Faith Shipping Co., Matina Shipping Co., and Meridian Ship Agency, Inc.

JAMES J. FLANAGAN STEVEDORES, DIVISION OF JAMES J. FLANAGAN SHIPPING CORP.

v.

M/V APOLLONIA in rem, Apollonia Holding, Inc., and Good Faith Shipping Co.

Civ. A. Nos. 87–2339, 87–3732.

United States District Court, E.D. Louisiana.

July 5, 1988.

As Amended Aug. 8, 1988.

Charles F. Lozes, Terriberry, Carroll & Yancey, New Orleans, La., for Apollonia and Good Faith.

Richard A. Goins, Adams & Reese, New Orleans, La., for Meridian.

Rene S. Paysee, Leach & Paysee, New Orleans, La., for Flanagan.

## AMENDING AND SUPERSEDING OPINION

CHARLES SCHWARTZ, Jr., District Judge.

Trial in these consolidated matters was held before the Court sitting without a jury on Friday, January 29, 1988. Having considered the stipulations made, the evidence presented, the record, and the applicable law, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they are

adopted as conclusions of law; to the extent any of the following conclusions of law constitute findings of fact, they are adopted as findings of fact.

This case began as an interpleader action in admiralty and concerns disputes over three cotton cargo loads that were shipped from Texas to Turkey. The time-charterer has paid no hire under its charter with the shipowner, has absconded with the freight paid to it by the shipper, and has not paid the stevedore that loaded the shipper's cargo; the charterer predictably has not appeared. The other three are left, each trying to recoup its losses from the absent charterer's breaches.

## FINDINGS OF FACT

### Stipulations between Apollonia and Meridian [1]

The M/V APOLLONIA is an oceangoing vessel of Liberian registry; it is owned by Apollonia Holding Co., Ltd. and is managed by Good Faith Shipping Co., S.A. (together, referred to herein as "Apollonia").

On March 20, 1987, Apollonia entered into a timecharter with Matina Shipping Co. on a standard 1946 edition New York Produce Exchange charterparty form ("NYPE46 form"),[2] with some modifications added by the parties, at a rate of $5000 per day for the APOLLONIA. The timecharter contained the customary Clause 2, requiring the charterer to pay the various fuel, port, and other related charges and expenses,[3] and Clause 8, concerning loading of cargo and signing of bills of lading.[4] The parties modified the customary Clause 18, on reciprocal liens by the shipowner and the timecharterer, to insert the phrase "belonging to the charterers" so that the shipowner's lien was limited to "all cargoes, and all sub-freights belonging to the charterer." [5]

On March 23, 1987, by way of a telex, Matina and Meridian Ship Agency, Inc. entered into a contract of affreightment. The telex provided that freight was to be fully prepaid into "owner's" bank on signature and release of the bill of lading and that the conline, or liner, bill of lading form [6] was to be used for the affreightment.

Pursuant to this affreightment contract, three liner bills of lading were issued: the first, CC–1, issued at Corpus Christi, Texas on April 10, 1987, for the shipment of 4626

1. The facts given in this Part are based on written stipulations between the two parties and undisputed facts established at trial.

2. For reprints of the NYPE46 form, see G. Gilmore & C. Black, *The Law of Admiralty* app. B, at 1003–10 (2d ed. 1975); 2B *Benedict on Admiralty* 7–76.11 to 7–82 (7th ed. 1988).

3. The clause reads in pertinent part: "That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes which vessel is responsible, then all such charges incurred shall be paid by the Owners...." The underlined phrase *constitutes* a typewritten addition the parties made to their NYPE46 form.

4. The clause reads in pertinent part: "That ... Charterers are to load, stow, and trim *[and] tally and discharge* the cargo at their expense under the supervision of the Captain, ... who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts." Again, the underlined phrase consti-

tutes a typewritten addition the parties made to their NYPE46 form; this change incorporates the modification made by the 1981 NYPE form, *see* N. Healy & D. Sharpe, *Admiralty: Cases and Materials* app., at 830–31 (2d ed. 1986).

An added Clause 41(a) also is relevant on this point. This clause read: "The Master to issue Bills of Lading for all cargoes carried under this Charterparty, if required by Charterers and without prejudice to the terms and conditions of the Charterparty. Charterers and/or their Agents are authorised to issue Bills of Lading on Owners'/Master's behalf according to the Mate's Receipts without prejudice to this Charterparty."

5. The clause, as modified, reads in pertinent part: "That the Owners shall have a lien upon all cargoes, and all sub-freights *belonging to the charterer* for any amounts due under the Charter ... and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once...." Again, the underlined phrase constitutes a typewritten addition the parties made to their NYPE46 form.

6. For a reprint of this form, see N. Healy & D. Sharpe, *Admiralty: Cases and Materials* app., at 836–38 (2d ed. 1986).

# 460

bales of cotton to Mersin, Turkey; the second, CC–2, issued at Corpus Christi on April 9, 1987, for 3411 bales of cotton to Istanbul, Turkey; and the third, GA–1, issued at Galveston, Texas on April 19, 1987, for 16,711 bales of cotton to Mersin, Turkey. The first two bills were claused with the same remarks:

> Approximately 60% cotton bales were found stained soiled in way of sampling cuts in protective coverings. These bales appear [to] have been sampled from two (2) sides with cuts being the full width, then delivered to the warehouse in that condition. The cotton in these bales has been soiled during handling due to the exposed cotton contacting the warehouse decking.

The third bill was claused with the same remarks as well as with the following additional remark:

> 3,231 bales of cotton stowed in No. 5 L.H. at shippers risk if contaminated with soya bean mills.

All three bills contained the boldfaced phrase "FREIGHT PREPAID." On instructions of Matina, the three bills were to remain in the custody of its local shipping agent, Biehl & Co., Inc., until Matina confirmed receipt of freight from Meridian.

Meridian and Apollonia did not enter into any charterparty or other contractual arrangement with each other. Specifically, Meridian did not agree to pay Apollonia charter hire or the cost of fueling and bunkering the APOLLONIA, and Apollonia did not agree to pay loading, discharge, or port expenses for Meridian's cargo.

According to telex instructions from Meridian to Matina, the Mersin bills (CC–1 and GA–1) were to be released against full payment of the Mersin freights. On April 21, 1987, telex discussions between Matina and Meridian began on the freight payment structure for the bills of lading. On April 22, 1987, Matina made demand on Meridian for payment of the freights on the Mersin

cargo; accordingly, on April 24, 1987, Meridian's bank in Baltimore, Maryland wired $358,735.23 to Matina's bank in London for full payment of the freight due on the Mersin cargo. Meridian, however, still owed $61,400.82 as the freight due on the Istanbul cargo.

Meanwhile, on April 23, 1987, charter hire of $72,187.50 from Matina to Apollonia became due but was not paid. On April 29, 1987, still not having received the charter hire payment yet, Apollonia gave Matina 48–hours notice of the withdrawal of the vessel from Matina's service under the charterparty.

On April 30, 1987, Apollonia telexed Biehl to instruct the APOLLONIA's master to sign the bills of lading with the term "FIOST" and not "liner terms."[7] On instructions of Matina, Biehl then brought the three bills by courier to New Orleans, where the APOLLONIA was then in port. Signing the three bills on April 30, the master struck out the word "Liner" from the three bills and substituted the words "Free and Out" in its place.

That same day, the APOLLONIA set sail for Limassol, Cyprus with all of Meridian's cargo on board. Pursuant to Matina's and Apollonia's instructions, Biehl kept the three bills of lading in its custody.

On May 5, 1987, Apollonia advised Biehl by telex that Matina has breached the charterparty and that Apollonia was withdrawing the APOLLONIA from Matina's service; Apollonia further instructed Biehl not to release the three bills of lading in its possession.

On May 6, 1987, Apollonia's counsel telexed notice to Meridian of Apollonia's intention to exercise its lien on cargoes and freights; he requested that Meridian provide particulars on the status of all freights. Later that day, in a telex to Biehl, Meridian demanded release of the Mersin bills of lading (CC–1 and GA–1); Meridian further advised that it was await-

---

7. The telex also included instructions in Greek to the master. These instructions were not translated for the Court, although the English words "free and out" and "liner terms" appear in these Greek instructions.

At trial, an Apollonia representative (V. Katsouris) explained that "FIOST" means "free in and out, stowed and trimmed."

ing instructions on the payment of freights for the Istanbul bill of lading (CC–2).

On May 13, 1987, after a dispute arose between Apollonia and Meridian over the change in clausing, Biehl commenced this interpleader action against Apollonia, Matina, and Meridian and placed the three bills of lading into the registry of this Court. Meridian wanted the three bills released on liner terms, while Apollonia wanted to exercise a lien on the entire cargo for the unpaid charter hire from Matina. Though served, Matina never appeared; on September 10, 1987, the Court entered a default judgment in favor of Biehl and against Matina.

After a hearing on May 21, 1987, the Court ordered as follows:

(1) Meridian Ship Agency, Inc. shall forthwith pay Apollonia the sum of $61,-400.82 representing the unpaid subfreight on B/L CC–2 whereupon Meridian Ship Agency, Inc. shall be discharged from any further liability to pay freight under this bill of lading;

(2) Upon payment of the sum of $61,-400.82 to Apollonia Holdings, Inc. B/L CC–2 shall be released from the Registry of the Court to Meridian Ship Agency, Inc.;

(3) B/L CC–1 and GA–1 shall be forthwith released from the Registry of the Court to Meridian Ship Agency, Inc.;

(4) Meridian Ship Agency, Inc. is ORDERED to pay all costs of discharging the cargo carried under B/L CC–1, CC–2 and GA–1;

(5) Biehl and Co. is discharged from any liability to Apollonia Holdings, Inc. and Meridian Ship Agency, Inc. in connection with the aforesaid bills of lading;

(6) Each party shall bear its own costs of Court.

Final judgment with these same six provisions was entered the following day, May 22, 1987. Accordingly, on May 22, 1987, the Clerk released the two Mersin bills of lading (CC–1 and GA–1) to Meridian's counsel.

Soon after, on May 25, 1987, the APOLLONIA arrived at Limassol to discharge some unrelated cargo. According to the vessel logs, the discharge was completed in the afternoon of May 28. From May 27 to June 1, 1987, for reasons not made known to the Court, the APOLLONIA was under arrest in Limassol. On the afternoon of June 2, 1987, the vessel sailed from the port of Limassol to drop anchor just outside the port, where the vessel remained until it set sail for Mersin on the afternoon of June 15, 1987. On June 3, 1987, upon learning that the arrest was lifted, Meridian paid Apollonia $61,400.82 for the Istanbul bill (CC–2).

Subsequent to the Court's order, a dispute arose between the parties as to the interpretation of the order's provision that Meridian pay all costs of discharging the cargo carried under the three bills of lading. As part of the dispute, Meridian filed a timely "motion for reconsideration" of the May 22nd judgment. On the one hand, Apollonia interpreted the order to require Meridian to prepay all port expenses and discharge costs. On the other hand, Meridian interpreted the order to require it to pay only discharge costs and further to permit it to obtain the discharge on credit terms instead of prepaid terms. Apollonia advised Meridian that the vessel would not be permitted into Mersin until the Turkish agents had funds in hand; Meridian advised that it did not have funds on hand to pay all discharge expenses.

On June 13, 1987, at a second hearing, the Court resolved the immediate dispute and made the following order:

(1) Meridian Ship Agency, Incorporated will deliver to counsel for Apollonia Holdings, Incorporated immediately, the sum of fifty thousand dollars.

(2) Meridian Ship Agency, Incorporated will pay the balance of the discharge expenses, amounting to twenty-eight thousand one hundred thirty-five dollars, no later than five p.m. Thursday, June 18, 1987.

(3) Meridian Ship Agency, Incorporated is enjoined from withdrawing from the registry of the Court bill of lading CC–2 until the said sum of twenty-eight thousand one hundred thirty-five dollars

has been paid to Apollonia Holdings, Incorporated.

(4) Upon payment of said sum of twenty-eight thousand one hundred thirty-five dollars to Apollonia Holdings, bill of lading CC–2 may be withdrawn from the registry of the Court by Meridian Ship Agency, Inc.

(5) If the said sum of twenty-eight thousand one hundred thirty-five dollars is not paid by Meridian Ship Agency, Inc. as set forth in paragraph (2) above, then bill of lading CC–2 will be subject to further Orders of the Court and motions by Apollonia Holdings, Incorporated.

At the hearing, Meridian's counsel paid Apollonia's counsel the $50,000; on June 15, 1987, Meridian paid Apollonia the remaining $28,135 for the Istanbul cargo; the Clerk then released the Istanbul bill of lading (CC–2) to Meridian. A partial satisfaction of judgment, signed by Apollonia's counsel to acknowledge Apollonia's receipt of the $78,135 and to consent to the Clerk's release of the Istanbul bill, states that "the Satisfaction of Judgment is without prejudice to the further rights of Meridian Ship Agency, Inc. and Apollonia Holdings, Inc. in these proceedings."

The vessel arrived at Mersin on the morning of June 16, 1987, but did not commence discharge of the cargo until the morning of June 30, 1987; of this two-week period of delay, six days were attributable solely to Meridian's having previously issued fraudulent bills of lading for the cargo. Meridian had deleted the "remarks clause" in order to make the three bills of lading clean bills of lading and sent the altered bills to the Turkish bank designated as the consignee on the instruments. Apollonia was unaware of these fraudulent bills of lading, until the vessel actually arrived at Mersin.

Apollonia decided to discharge the Istanbul cargo at Mersin instead of at Istanbul and paid the receiver of the Istanbul cotton the sum of $15,000 as an offset to trucking expenses from Mersin to Istanbul. It would have taken the vessel five days to carry the Istanbul cargo from Mersin to Istanbul. Because the entire cotton cargo

was discharged in Mersin, Apollonia was spared the costs of port expenses associated with a discharge in Istanbul. Sark Express, the Turkish shipping agent, estimated that the port expenses in Istanbul would have been $12,889.

Sark's entire bill for Mersin totalled $99,608.99. This figure included the discharge expenses of $40,893.47, the trucking costs of $15,000.00, port costs of $26,223.61, an inward commission of $7,250.00, an agency fee of $4,400.00, and an attendance fee for the discharge agent of $5,581.91.

On June 10, 1987, Apollonia's counsel in Antwerp, Belgium obtained security from Matina in the form of a $100,000 "Bankguarantie," which was issued by Kredietbank N.V. and intended to cover Apollonia's claims against Matina for damages, detention, and hire through June 10, 1987. The calculations for this sum were based on a voyage free of all interruptions and did not include discharge expenses, stevedoring expenses for loading, or port expenses at the discharge sites.

The APOLLONIA was continuously employed for at least six months prior to the voyage in question and had been continuously employed since. During May and June, 1987, Apollonia made repeated efforts to obtain charterparty fixtures for the vessel but could not do so because of the delays associated with this matter.

The hire charter rate for the APOLLONIA on the voyage in question was $5000/day plus diesel oil expenses, which averaged $350/day; the daily operating expense for the APOLLONIA at the time was $2785/day.

### Trial between Apollonia and Meridian

Unable to resolve certain disputes concerning the delays in Cyprus and Turkey, each party called one witness at trial.

### Mr. V. Katsouris for Apollonia

Apollonia called Mr. V. Katsouris, who is in charge of Apollonia's legal and claim department in Greece and who personally handled the cargo disputes in question.

He stated that the sole reason for the delay from June 1 to June 15 outside of Limassol was Meridian's refusal to pay the Mersin port and discharges expenses in advance to the Turkish shipping agent. He added that the Antwerp proceedings against Matina had nothing to do with the vessel's remaining in Cyprus. *See also* Meridian Exh. I.

Not until the vessel arrived in Mersin did Apollonia learn that Meridian had issued false bills of lading to the Turkish receiver. Characterizing Turkey as "a difficult jurisdiction," Mr. Katsouris thought it a good deal to both Apollonia and Meridian to discharge the Istanbul cargo at Mersin in order to avoid even further costs from further delays.

Mr. Katsouris explained that Apollonia sent a port captain and then himself to Turkey in order to negotiate with the Turkish receivers concerning the false bills of lading; had there been no problems with the bills of lading, he added, neither he nor the port captain would have been sent to Turkey, just as Apollonia, in keeping with the standard industry custom, sent none to Galveston or New Orleans. The port captain remained in Mersin during the vessel's 27–day stay in Mersin; the length of Mr. Katsouris' stay was not given. Mr. Katsouris' expenses in Turkey amounted to $100–120/day (including $50/day for room and lodging); in addition to his regular (undisclosed) salary, he also had a $300/day fee for negotiating with the Turkish receivers. His airfare from Athens to Mersin totalled $990.

Mr. Katsouris stated that Apollonia did not save the five-day sailing time from discharging the Istanbul cargo in Mersin because the APOLLONIA's next voyage was in the Black Sea. He added that the charter market was rising at that time, but offered no evidence of what the market rate actually was at that time.

Concerning Sark's invoice, he stated that the $7,250 inward commission and the $4,400 agency fee (as well as the discharge agent's $5581.91 attendance fee) were entirely attributable to cargo and were not port expenses, for without discharge, such expenses would not have been incurred.

Mr. Katsouris interpreted the Court's May 21st order to require Meridian to pay both port and discharge expenses. At no time prior to the June 13th hearing, however, he added, did Meridian agree to pay even any *discharge* expenses alone.

Concerning the Bankguarantie, Mr. Katsouris stated that it was pure coincidence that Apollonia stopped pressing Meridian for the Mersin port expenses as soon as it received the guaranty. He added that the $100,000 guaranty would not begin to approach the amount Apollonia lost in unpaid hire from Matina for the approximately 95 day voyage and was only a minor security for any arbitral award Apollonia might obtain from Matina.

### Mr. C. Firing for Meridian

Meridian called its employee Craig Firing, whose duty it was to supervise the cotton cargoes at issue. He disagreed with Mr. Katsouris about the custom of appointing port captains; according to Mr. Firing, every shipping company sends port captains to supervise all loadings and discharges. As the discrepancies and lack of explanations illustrate, the Court finds Mr. Firing to have not been fully candid with the Court and thus follows Mr. Katsouris' more realistic position on this point. Besides, despite the ease for Meridian to demonstrate such if true, Meridian offered no evidence that Apollonia had sent a port captain to the United States when the cargo was loaded aboard the APOLLONIA.

Mr. Firing went to great lengths to suggest that the refusal on June 11, 1987 by Sark, the Turkish shipping agent, to extend any credit to Meridian for the discharge/port expenses was solely the fault of Apollonia's and had nothing to do with Meridian's (un)creditworthiness. He stated that Meridian had dealt with Sark several times before and claimed that he had established a credit arrangement with Sark from May 22 to June 9, the date Apollonia asked Meridian to nominate a local shipping agent in Mersin. He was unable, however, to produce any documentary evidence of any

credit arrangement during that period or of any prior dealings with Sark.

Mr. Firing claimed that there was lack of such documentary evidence because (1) "80%" of his communications with Sark were by telephone and (2) he did not know the location of the APOLLONIA for over two weeks. While the second explanation does little to explain the reason for no telexes, of which there are otherwise a plethora in the record, it does suggest unreliability on Mr. Firing's part: Meridian was not concerned with the vessel's location until the Court ordered Meridian on May 21 to pay the discharge expenses, and within at most ten days thereof, Meridian definitely knew the vessel was in Limassol because its counsel indicated as much in its motion for reconsideration filed June 1.

Mr. Firing admitted that Meridian had had prior disputes with Sark, but suggested that this fact had nothing to do with Sark's demand for prepayment. At trial, Mr. Firing stated he could not recall whether Meridian would have been able to pay the discharge expenses at the time of the May 21st judgment and was equivocal in stating that Meridian could "maybe" have paid such expenses at any time prior to June 13. Meridian's counsel has been more forthright in admitting Meridian's shaky state. At the June 13th hearing, he stated that, as of that Saturday, Meridian was unable to pay more than $50,000; further, he has stipulated that Meridian advised that it did not have funds on hand to pay all discharge expenses. The Court finds that while Meridian may have been negotiating for credit terms with Sark, it never established such—Sark wisely required prepayment from Meridian, for Meridian appeared at most dubiously able to pay— and that Apollonia was in no way responsible for Meridian's failure to obtain Sark's services on credit terms.

### Stipulations between Apollonia and Flanagan

James J. Flanagan Stevedores, division of James J. Flanagan Shipping Corporation, is a Texas corporation engaged in the stevedoring business in both Corpus Christi and Galveston.

At some time not known to the Court, Flanagan and Matina entered into a loading contract for Meridian's cotton cargo loads at the rate of $6.00 per bale plus extras. At no time did Flanagan ever have a loading contract with Apollonia for this cargo.

On April 10, 1987, Flanagan loaded 8,037 bales of cotton aboard the APOLLONIA in Corpus Christi (the Mersin cargo under CC–1 and the Istanbul cargo under CC–2) and, pursuant to its agreement with Matina, billed Matina a $50,991.46 invoice therefor. On April 19, 1987, Flanagan loaded 16,771 bales of cotton aboard the APOLLONIA in Galveston (the Mersin cargo under GA–1) and, pursuant to its agreement with Matina, billed Matina a $112,978.12 invoice therefor. The amount of each invoice is fair and reasonable for the services provided. Neither invoice has been paid in full or in part.

On August 7, 1987, Flanagan filed suit in this Court against Apollonia and Good Faith *in personam* and the APOLLONIA *in rem*. The vessel, however, was never seized, and Apollonia has not made an appearance as vessel claimant. Neither party presented any testimony on the stevedore issue.

### CONCLUSIONS OF LAW

Because these consolidated matters are admiralty and maritime matters within the meaning of F.R.Civ.P. 9(h), this Court has jurisdiction under 28 U.S.C. § 1333(1). Below, the Court addresses first the disputes between Apollonia and Meridian and second the disputes between Apollonia and Flanagan.

#### I. *Apollonia and Meridian*

Apollonia and Meridian have essentially two disputes: (1) what amounts paid by Meridian to Apollonia were made to satisfy liens that Apollonia had perfected, and (2) how should the various discharge, port, and operating expenses as well as any lost hire be allocated between Apollonia and Meridian.

## A. Liens on Meridian's Subfreights and Cargo

Implicit in the Court's May 21st order was the holding that Apollonia could legally assert a lien against Meridian solely for the outstanding Istanbul freight of $61,-400.82. Below, the Court reaffirms this holding and now denies Meridian's June 1st motion to alter judgment.

■ It is well established under general maritime law that in order to compensate for a charterer's breach (which is usually non-payment of charter hire), a shipowner may, in certain circumstances, collect under a lien on cargo owned by, and freights owed by, a person who is not in privity with the shipowner.[8]

Two general conditions are necessary for a shipowner to maintain a lien against such a third person. First, the shipowner must have a contractual right to assert the lien; second, the shipowner must properly perfect the lien. Below, the Court addresses the two points in turn.

### 1. What liens might Apollonia have asserted against Meridian?

■ In order for a shipowner to be permitted under the law to assert a lien against a third-party cargo owner, the charterparty between the shipowner and the bill-of-lading issuer must give contractual rights for the shipowner to assert the lien against the cargo owner.[9] Specifically, the timecharter between Apollonia and Matina must contractually provide Apollonia the right to assert liens against Meridian.

■ Here, Apollonia and Matina specifically altered the lien provision in their standard NYPE46 timecharter by inserting the phrase "belonging to the charterer" in Clause 18.[10] This change brings the timecharter's lien provision more closely in line with Clause 18 of the Baltime Charterparty form, which reads as follows:

> **Lien** The Owners to have a lien upon all cargoes and sub-freights belonging to the Time–Charterers and any Bill of Lading freight for all claims under this Charter....[11]

As one commentator has suggested, the Baltime form is more favorable to cargo holders with respect to the shipowner's lien provision than is the NYPE form.[12] While at least one English judge has held that the phrase "belonging to the Time–Charterers" does not modify the phrase "all cargoes" in the Baltime form,[13] this Court does not believe that such a syntactic construction is warranted. First, there can be little explanation for the drafters of this standard form to have provided a narrow scope with respect to subfreights but a broad scope with respect to cargo; if any logical distinction were made, it would be the opposite one (i.e., scope on cargo to be narrower than scope on subfreights). Because a lien on all subfreights (including sub-subfreights, sub-sub-subfreights, etc.) amounts in essence to an agreed assignment of debts to the freight owner, a lien on just subfreights would not upset the cargo owner's prior expectation of its bargain that it must pay freight for the carriage of its cargo, whereas a lien for the full amount of the cargo would certainly dash the cargo owner's prior expectations. Second, because subfreights do not "belong" to cargo owners, the Baltime form phrase "belonging to the Time–Charterers," or the instant charterparty's phrase "belonging to the charterer" would serve little purpose if the phrase were not understood also to modify the phrase "all cargoes."[14] While the in-

---

**8.** See generally 2 Benedict on Admiralty §§ 42–43, at 3–49 to 3–58 (7th ed. 1986); Gilmore & Black, supra note 2, at 630 & n. 103, 641; W. Tetley, Maritime Liens and Claims 348–53 (1985).

**9.** E.g., Tetley, supra note 8, at 349; Gilmore & Black, supra note 2, at 632 n. 103.

**10.** See supra note 5.

**11.** 2B Benedict, supra note 2, at 7–5.

**12.** Tetley, supra note 8, at 352.

**13.** See The Aegnoussiotis, [1977] 1 Lloyd's Rep. 268, 276.

**14.** Cf. Royal St. Louis, Inc. v. United States, 578 F.2d 1017, 1018 (5th Cir.1978); Lambert v. Maryland Casualty Co., 418 So.2d 553, 559–60 (La. 1982) (under Louisiana law, a court ought, where possible, construe a contract to give effect to every clause in the contract).

stant charterparty form has a residual comma in between the phrases "all cargoes" and "subfreights," the Court cannot deem the parties' failure to edit this comma from the preprinted NYPE form to be tantamount to an intent for the added phrase "belonging to the charterers" not to modify "all cargoes." The parties' specific change to the NYPE46 form, in sum, evinces their objective intent to restrict the shipowner's liens against third persons.

Put simply, the Court holds that the instant timecharter form as amended by the parties grants Apollonia the right to assert a lien, at the most, on cargo owned by Matina and on subfreights owing to Matina; Apollonia had no right at any time to assert a lien against Meridian for unpaid charter hire from Matina in an amount in excess of the subfreights owing to Matina. Apollonia thus had no right to assert a lien on the full amount of Meridian's cargo (as opposed to on the subfreights therefor). For this reason, Apollonia's position that it was entitled to have its master rephrase the bills to "free and out" must fail.[15]

### 2. *What liens did Apollonia perfect against Meridian?*

Having established that Apollonia had the right under its timecharter to assert liens only on the Meridian's freights to Matina (and not on the entire amount of Meridian's cargo), the Court must also determine whether Apollonia properly perfected a lien on any of these freights.

Meridian does not dispute that Apollonia was properly due the $61,400.82 in order to avoid Apollonia's formally asserting a lien on the Istanbul cargo. Apollonia suggests, however, that it perfected a lien for the $358,735.23 that Meridian paid to Matina's bank on April 24 for the Mersin freight. Thus, the Court must determine whether Apollonia perfected a lien on both the Mersin and Istanbul freights or instead on only the Istanbul freight.

■ While the extent of notice is unsettled,[16] a cargo owner must have notice of a shipowner's right to assert a lien—be the notice from language in the bill of lading or otherwise—in order for the ship owner to perfect the lien. If a cargo owner pays its owing freight to the bill-of-lading issuer before the cargo owner has legally proper notice of the shipowner's right to assert a lien for payments due to the shipowner from the bill-of-lading issuer, then the shipowner does not perfect its lien against the cargo owner. The issue, then, is whether Meridian had "proper legal notice" on April 24, when it paid Matina all pending freight on the Mersin cargo.

■ While Matina did not pay hire when due on April 23, Apollonia waited until April 29 to demand that Matina pay the hire within 48 hours and waited until May 5 to advise any third persons (May 6 for Meridian) about the breach—even though Apollonia was aware of Meridian's existence at least by April 30, when Apollonia

15. *Cf. John S. Connor, Inc. v. Marine Transport Services Inc.,* 1981 A.M.C. 359, 374–75 (D.Md. 1980) (citing Allen, *Liens: Liabilities Arising from Delays or Failure in Performance,* 49 Tulane L.Rev. 970, 972 (1975)) (master has a duty to sign bills of lading as presented, but bill-of-lading's lack of incorporation of charterparty's lien provision does not foreclose a shipowner from asserting a lien on subfreights).

While there was little testimony on the intended effect of changing the bills of lading from "liner" to "free in and out," or "FIOST," the parties' dispute implies that the change, if legally permitted, would have required Meridian, as a matter of contract, to bear all port and discharge expenses under its bills of lading.

16. *Compare* Tetley, *supra* note 8, at 349 ("clear" notice is necessary and mere notice of a charterparty is insufficient) *and Toro Shipping Corp. v.*

*Bacon–McMillan Veneer Manufacturing Co.,* 364 F.2d 928, 930 (5th Cir.1966) ("The shipowner has a maritime lien for charter hire on cargo where a lien is reserved initially in the original charter and expressly incorporated into the bills of lading *except* as against a good faith purchaser of the cargo who has paid for it in advance without notice of the shipowner's rights.") (dictum in controlling part) *with Sarma Navigation, S.A. v. Navibec Shipping Ltd.,* 1979 A.M.C. 1050, 1057 & n. 1 (S.D.N.Y.1979) (mere reference to B/L issuer as a "charterer" is sufficient notice) *and The Solhaug,* 2 F.Supp. 294, 300–01 (S.D.N.Y.1931) (same) *and* 2 *Benedict, supra* note 8, § 43, at 3–57 to 3–58 (citing *Union Industrielle et Maritime v. Nimpex International, Inc.,* 459 F.2d 926, 929–30 (7th Cir.1972) for proposition that a cargo owner has the duty, at the time of paying freight, to inquire whether any amounts are due and unpaid to the shipowner).

instructed Biehl to have the master re-clause and sign Meridian's bills of lading. Apollonia waited, in two words, too long.

While Meridian paid Matina's bank for the Mersin freight *after* Matina's hire to Apollonia was due, the fact alone was insufficient to trigger Apollonia's right to perfect a lien on that freight. For that fact alone in no way constitutes notice, whether the standard for notice be actual or constructive. The bills of lading themselves indicate nothing to have put Meridian on notice that Matina was not the shipowner; the telex fixing the contract of affreightment specifically refers to Matina as "owner." Additionally, on April 22, the date Matina demanded that Meridian make the freight payment to Matina's bank, Matina's charter hire was not yet due and thus Apollonia's right to perfect a lien had not yet ripened.

Whatever the standard of notice, the Court ought not demand that Meridian bear all risks for not learning about Apollonia's potential lien, for there was no evidence that Meridian subjectively knew, or should have reasonably inferred, that Matina was not the actual shipowner. Otherwise, the notice requirement would be rendered nugatory. While a shipowner might show that it is accepted industry practice that a cargo owner ought make further "due diligence" inquiries even when there is no specific oral or written indication of any potential lien at the time the cargo owner pays its freight to the bill-of-lading issuer, no evidence whatever in this case was presented on any such industry practice.

Thus, Apollonia was not entitled to assert any lien on the Mersin freights, for Meridian paid those freights in the normal course of business without any direct or indirect notice from Apollonia about its lien.[17] In other words, of the $139,535.23 that Meridian has paid Apollonia by order of this Court, only $61,400.82 of it is attributable to payments for satisfying Apollonia's liens for unpaid charter hire.

■ Meridian suggests that Apollonia is still not entitled to have this $61,400.82 treated as a lien payment because Apollonia received the $100,000 letter of credit for all hire, damages, and expenses from Matina for the period up to June 10. The Court need not resolve the issue implicit in Meridian's suggestion—whether this $100,000 should be treated as a complete settlement of Matina's obligations to Apollonia as of June 10 such that Apollonia may perfect no lien on a third person (Meridian)'s freight payments originally owing to Matina—for there is no evidence to suggest that Matina has satisfied its charter obligations to Apollonia for the period following June 10. Since Meridian's cargo was being unloaded at Mersin at least as late as July 11,[18] it appears that Matina still owes Apollonia over $150,000 in addition to the $100,000 from the letter of credit, even if indeed Apollonia may draw on the full amount of the letter; further, the $100,000 did not cover any damages to Apollonia for having to pay any port expenses.

■ Meridian further suggests that any discharge expenses be deducted from this $61,400.82 because Meridian's bill of lading provides for Matina, and not Meridian, to bear these expenses. Meridian miscomprehends why Apollonia is entitled to this money. The money is not for Apollonia's services in carrying the cargo; rather, it is a form of legal assignment of Meridian's debt to Matina. Apollonia was under no obligation to carry Meridian's cargo to Turkey after Matina breached the timecharter; had Apollonia desired, it could have rightfully returned the cargo to Texas under the *Luckenbach* [19] rule. In short, Apollonia's

---

17. Thus, the Court need not address the extent, if any, to which Apollonia could perfect a lien for more than Meridian has actually paid Apollonia—now that the cargo has been completely discharged from Apollonia's control and sold to a Turkish consignee of Meridian's. In other words, the Court does not decide whether a freight lien survives any transfer of the cargo from the ship owner's possession, dominion, or control.

18. *See* Apollonia Exh. D–9 (vessel logs from April 9 to July 11, 1987).

19. *See Luckenbach v. Pierson,* 229 F. 130 (2d Cir.1915), *cited with approval in Cardinal Ship-*

right to perfect a lien on Meridian's freight owing to Matina for the Istanbul cargo is wholly independent from any expenses related to the carriage of the Istanbul cargo.

In sum, because Meridian has already paid Apollonia the full sum of $61,400.82 for Apollonia's sole viable lien against Meridian, no further amounts are owing for any lien and no setoffs may be made against this amount already paid.

### B. *Allocating the Expenses*

Apollonia and Meridian dispute who should bear the various discharge, port, and delay expenses arising in Cyprus and Turkey. Below, the Court addresses the three general groups of expenses: (1) expenses from Meridian's fraudulent bills of lading, (2) the port and discharge expenses, and (3) expenses from the delay outside Limassol.

■ Meridian concedes that it is responsible for the expenses incurred in connection with its having issued fraudulent bills of lading to its Turkish consignee; the parties have stipulated that the delay attributable to this conduct was six days. The parties dispute, however, what the proper amount of these expenses should be. Meridian argues that the daily rate should be at the vessel's operating expense rate of $2785/day, while Apollonia argues that the daily rate should be at the $5000/day-plus-fuel charter hire rate. For two reasons, the Court agrees with Meridian. First, these two parties never had any contract between them whereby Meridian agreed to pay Apollonia at the same rate as did Matina. Second, Apollonia presented no evidence of what the market charter rate near Turkey, or anywhere else, was around that time. Thus, the Court fixes the operating expenses from this delay at $16,710. The parties also dispute Mr. Katsouris' expenses. The Court finds Mr. Katsouris' testimony convincing that Apollonia would not have sent him, had it not been for the false bills of lading. While the length of

Mr. Katsouris' stay in Turkey appears to have been longer than six days, the Court limits Apollonia's recovery of his daily expenses and fee to these six days.[20] Thus, the Court fixes his expenses at $3,390 (six days at $400/day ($100 for expenses and $300 for his fee to Apollonia) and $990 for his airfare to Mersin). In total, the Court holds Meridian responsible in the amount of $20,100 for having issued false bills of lading.

■ Because Matina was to pay all operating, discharge, and port expenses, any allocation of these expenses between the present parties necessarily results in an innocent party bearing the loss. The Court determines that the terms of the respective contracts with Matina can best be effected and damages most equitably apportioned by Meridian's paying the discharge expenses and Apollonia's paying the port and general operating expenses.

As for port and general operating expenses, Apollonia as shipowner was in the better position to minimize the loss. To a great extent, these costs do not vary proportionately to the amount of cargo at issue; the port costs for taking one load of cargo each to two separate ports, all other things equal, are roughly twice as high as those for taking the two same loads to one port. A rule to the contrary would give no incentive to a shipowner to exercise its *Luckenbach* rights the cheapest way it can. Thus, Apollonia must bear the $26,223.61 port expenses in Mersin.

The same result, however, does not follow for discharge expenses. As both Sark's unloading charges and Flanagan's loading charges illustrate, discharge expenses are largely proportionate to the amount of cargo at issue. Thus, the Court ought not presume the vessel owner is in a significantly better position to minimize this cost. The cargo owner, in fact, would appear the better one to minimize discharge expenses. Nor is the *Luckenbach*

*ping Corp. v. M/S SEISHO MARU,* 744 F.2d 461, 468 (5th Cir.1984).

**20.** His stay longer than six days implies that he handled business besides his need to handle the fraudulent bills of lading. The Court does not,

however, take this implication to be sufficient evidence to show that Mr. Katsouris would have gone to Turkey regardless of whether any fraudulent bills of lading had been issued.

rule to the contrary, for it merely requires the shipowner to discharge cargo at either its loading or discharge port and states no rules on who between the shipowner and the cargo owner must bear what costs for any discharge.

Mr. Katsouris testified that the agency fee, the incoming commission, and the attendance fee are all costs solely incurred when there is cargo to be discharged, and no contrary evidence on this point was presented. Thus, the Court holds Meridian responsible for these and the stevedore discharge expenses, which together amount to $58,125.34.

Following the same equity analysis, the Court determines that Apollonia should bear the $15,000 trucking expense for the Istanbul cargo. Had Apollonia carried this cargo to Istanbul, then Meridian would have paid a proportionately smaller discharge expense in Mersin, the rough difference saved to be paid for discharge in Istanbul; thus, the trucking saved Meridian little, if any, expense.[21] While Mr. Katsouris explained Turkey as a "difficult" jurisdiction and suggested that Apollonia actually saved Meridian money by not taking the Istanbul cargo to Istanbul, the Court cannot accept his comments as sufficient to place the burden on Meridian, especially since he was of the erroneous position that Meridian was the one to bear the port and general operating expenses. Upon discharging all cargo at Mersin, Apollonia was then free of any obligations to Meridian; that Apollonia may have chosen to fix its next voyage from a port in the Black Sea is insufficient to make Meridian pay for this trucking expense.

█ The final dispute between Apollonia and Meridian concerned the thirteen day delay off Limassol from June 2 to June 15. The Court finds fault by both parties. On the one hand, Apollonia certainly had the right not to advance any discharge expenses on Meridian's behalf, in light of the substantial evidence that Meridian may

have been unable to repay such amounts. On the other hand, Apollonia did not have the right to demand that Meridian prepay not only the discharge expenses, but also the port expenses. Noting that on May 21 the Court explicitly ordered Meridian to pay all discharge expenses, that Meridian still paid no money even after Apollonia quit making explicit demands around June 10 that Meridian pay the port expenses as well, that the discharge expenses alone were more than the $50,000 Meridian finally paid on Court order on June 13, and that Meridian was apparently unable to pay any money earlier, the Court determines that Apollonia's improper demand was insufficient to relieve Meridian from having to bear the responsibility for this delay. Because Apollonia did not request that Meridian nominate a local agent in Mersin until June 9, however, the Court finds that Meridian is only responsible for six days of this delay. Thus, the Court holds Meridian responsible for a further $16,710 (6 days × $2785/day). In its discretion, however, the Court finds that Apollonia's improper demand should preclude it from any attorney's fees, prejudgment interest, or other compensable damages it might otherwise be due because of Meridian's delay in complying with the Court's May 21st order.

In sum, the Court hold that Meridian is responsible for a total amount of $94,935.38. Because Meridian has already paid $78,135 under previous Court order, Apollonia is entitled to a judgment against Meridian for the difference of $16,800.38, together with interest from date of judgment.

## II. Apollonia and Flanagan

█ The dispute between Apollonia and Flanagan is a purely legal one: may a stevedore assert a claim against a ship owner *in personam* for unpaid stevedoring expenses incurred by the ship owner's charterer? In the instant case, the answer is no.

Stevedores generally may assert liens against vessels *in rem* for unpaid stevedor-

---

**21.** For this reason, the Court must reject Meridian's claim for a setoff in the amount of the estimated port expenses at Istanbul. Otherwise, Apollonia would bear a double loss.

**470**

ing services.[22] Because the APOLLONIA was never arrested and Apollonia never made an appearance in either matter as vessel claimant,[23] however, Flanagan never perfected *in rem* jurisdiction over the APOLLONIA. Thus, the sole basis for recovery is limited to *in personam* claims.

Flanagan argues that Apollonia was unjustly enriched from Flanagan's services because without Flanagan's stevedoring services, Apollonia could not have asserted a lien against Meridian. As sole support for this position, Flanagan cites *Gulf Oil Trading Co. v. Creole Supply and Creole Shipping, Ltd.*[24] For several reasons, the Court must reject Flanagan's theory of recovery.

First, it can hardly be said that Apollonia has been "enriched." Even considering the $95,000 from Meridian for certain expenses and the $61,400 from Meridian for the subfreight lien and even assuming that Apollonia has received or will receive the full $100,000 from the guaranty, Apollonia is far from being made whole; as already noted, Matina still owes Apollonia well over $100,000.

Second, the alleged "benefit" (recovery of $61,400 for a lien on subfreight) is considerably smaller than the $164,000 Flanagan seeks.

Third, the inequities in *Gulf Oil Trading* are simply absent in this case. Unlike the bank in *Gulf Oil Trading*, Apollonia has not done anything secretive, fraudulent, or otherwise inequitable. Apollonia did not lure Flanagan into loading the cargo on credit terms.

In short, the Court holds that Flanagan has no claim for unjust enrichment, or "quasi-contract" recovery. Its sole *in personam* remedy is against Matina.

---

22. *TTT Stevedores of Texas, Inc. v. M/V JACAT VIJETA*, 696 F.2d 1135, 1138 (5th Cir.1983); *see* 46 U.S.C.App. § 971.

23. *Cf. Cactus Pipe & Supply Co. v. M/V MONTMARTRE*, 756 F.2d 1103, 1108–11 (5th Cir.1985) (if a vessel owner files a claim of owner of the vessel, arrest of the vessel is unnecessary to perfect *in rem* jurisdiction).

## CONCLUSION

All three survivors of this debacle have suffered significant losses because of Matina's breaches. Without Matina and whatever assets it may have, this Court is, however, unable to render any of the other three whole. While perhaps a vain reminder, the Court notes that each of the three may still seek recovery from Matina if Matina can be found.

The Clerk of Court is hereby directed to enter a final judgment in favor of Apollonia and against Meridian in the amount of $16,-800.38, together with interest from date of judgment, Meridian to bear all costs, and a separate final judgment dismissing Flanagan's complaint with prejudice, Flanagan to bear all costs.

24. 596 F.2d 515 (2d Cir.1979); *see also Swift & Co. Packers v. Compania Colombiana del Caribe*, 339 U.S. 684, 691–92, 70 S.Ct. 861, 866, 94 L.Ed. 1206 (1950) (courts in admiralty have the power to grant equitable relief).