FINORA COMPANY, INC., Plaintiff,

v.

AMITIE SHIPPING, LTD., Defendant.

Civ. A. No. 2:92–2967–18.

United States District Court,
D. South Carolina,
Charleston Division.

May 23, 1994.

Benjamin Allston Moore, Jr., Charleston, SC, for plaintiff.

Dennis J. Christensen, Charleston, SC, for defendant.

### ORDER

NORTON, District Judge.

### I. BACKGROUND

This non-jury, Rule 9(h) admiralty action was tried before this tribunal on March 29–30, 1994. The court received the testimony of several witnesses, both in person and by deposition. The court has reviewed all of the documents that were put into evidence, and has heard final arguments from counsel. Having considered the testimony and exhibits admitted at trial, and the pre-trial briefs and proposed orders submitted by the parties, this court now makes the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

1. In maritime terminology, the daily amount due to an owner from a charterer under a time charter is known as "Hire." When the time charterer sub-charters the vessel to a third party,

### II. FINDINGS OF FACT

1. Plaintiff, Finora Company, Inc. (hereinafter "Finora"), is a wholly owned subsidiary of Norfoods, Inc., and both are Delaware corporations.

2. Defendant, Amitie Shipping Limited (hereinafter "Amitie Shipping"), a Panamanian corporation, at all applicable times was the owner of the motor vessel AMITIE, which flew the Maltese flag. The actual handling of all matters involving the M/V AMITIE was performed by Amitie Shipping's agents, Nicholas Moundreas Shipping, S.A. (hereinafter "Moundreas"), of Piraeus, Greece. Nicholas Moundreas himself was a part owner of the vessel.

3. On February 20, 1992, Amitie Shipping entered into a time charter of the vessel with V. Mueller A/S, of Copenhagen, Denmark, utilizing the basic New York Produce Exchange form, to which was added a number of additional clauses. That Charter Party provides, in Clauses 4 and 5, that V. Mueller would pay charter hire of $5,600.00 per day, payments to be made in Piraeus, Greece, every fifteen (15) days, and in advance. The Charter also provides, in Clause 18, that Amitie Shipping "shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter...."[1] Plaintiff's Ex. A–1.

4. Almost from the start of the Charter, V. Mueller was lax in its payment of charter hire to Amitie Shipping. In evidence is a schedule of the due dates of the hire payments, and the dates on which they were received. Batayiannis Deposition, Defendant's Ex. 2. V. Mueller first sub-chartered the vessel to an entity called World Food Program, and for whatever reason, V. Mueller's hire payments to Amitie Shipping began to fall farther and farther behind. The third payment, due March 25, 1992, was not received until April 10, 1992. Moundreas, primarily through its chartering broker, Aris Batayiannis, put great pressure upon V. Mueller to bring their payments up to date in the form of telephone calls and telexes.

on a voyage charter, the amount due the time charterer by the third party is called "Sub-Freights."

Plaintiff's Ex. B(1–42); Batayiannis Deposition, p. 88.

5. On April 25, 1992, V. Mueller A/S, as agent for disponent owner Crown Marine Management (hereinafter collectively referred to as "V. Mueller"), entered into a Voyage Sub–Charter of the vessel with Finora utilizing the Uniform General Charter ("Gencon") form, to which were added a number of additional clauses. Plaintiff's Ex. A–2. That Charter provided that the vessel would be ready to load on April 29, 1992, in the Port of Mongla, Bangladesh; that the vessel would load cargos of baled jute and burlap in Mongla and Calcutta, India; that the discharge port for the cargo would be, at Finora's option, a port on the United States East Coast or Gulf, and that Finora also had the option of naming a second discharge port on the U.S. East Coast or Gulf. *Id.*

6. Under the terms of Clause 27 of the Voyage Charter, Finora agreed to pay "freight" at a given rate based upon the tonnage loaded and the place of the second discharge port, if one were selected. Plaintiff's Ex. A–2, Cl. 27. Upon completion of loading in full, 95% of the freight due would be payable within three banking days of the signing and releasing of the bills of lading, and the balance of 5% within thirty (30) days after the completion of discharge. *Id.* The freight was deemed to be "paid upon receipt of confirmation from remitting bank, by telex, that the freight has been remitted into owner's account." *Id.* The parties agree that the full net amount of the freight due V. Mueller from Finora, after commissions, was $326,040.00.

7. Box 18 of the face page of the Voyage Charter sets the demurrage rate under the charter as U.S. Dollars $5,000.00—per day, pro-rata/half dispatch working time saved both ends.[2] Plaintiff's Ex. A–2.

8. The calculation of demurrage and allowable lay-time is further set forth in Clause 23 of the Voyage Charter, which provides that the charterer is permitted lay-time at loading and discharge in the amount of "20 weather working days, FHEX [Fridays, holidays excluded] at Mongla, Bangladesh, SHEX [Saturdays, holidays excluded] at Calcutta, India, and SATSHEX [Saturdays, Sundays, holidays excluded] in discharge port(s), even if used at both ends. Owners option to order and pay for loading and/or discharge during such excluded time, in which case time used to count as lay time. Time to count at Calcutta as vessel 2nd load port on berthing." Plaintiff's Ex. A–2, Cl. 23.

9. In evidence is a lay-time calculation that was prepared by Mr. Walter Muff of Finora, and which was prepared in accordance with the terms of the Voyage Charter utilizing the dates on which the vessel's "Notice of Readiness" was accepted by the ship's agents, and further utilizing the "Statement of Facts" prepared by the vessel's agents at each port, which consists of a summary of loading and discharge operations of the stevedores at the various load and discharge ports. Plaintiff's Ex. E–1(A–E). Based on these calculations, Mr. Muff concluded that demurrage in the amount of $270.70 is owed to Amitie Shipping. *Id.* at E–1(E). A similar lay-time calculation was introduced into evidence by Defendant Amitie Shipping, and calculates demurrage owed by Finora to Amitie Shipping in the amount of $83,535.17. Defendant admitted that these calculations were not prepared strictly in accordance with the terms of the Voyage Charter, but were instead based on a "working copy" of the charter party that contained terms that were different from the original charter party.[3]

10. Under the terms of the Voyage Charter, and specifically Clause 5(b) and Clause

---

**2.** "Demurrage" refers to additional payments required by the charter for use of the vessel after the expiration of lay-time allowed under the Charter Party at the loading and discharge ports. Gilmore and Black, *The Law of Admiralty* § 4–8, at 210–213 (2nd Ed.1975). "Dispatch" is the reverse of demurrage, and allows for the reduction in freight if loading and discharging is accomplished before the allowable lay-time has expired. *Id.* at 212.

**3.** The court cannot adhere to calculations made pursuant to a "working copy." Defendant's Ex. D–2. At trial, the parties agreed to the final Voyage Charter's introduction into evidence as the controlling charter agreement and the court must follow its guidelines. The evidence at trial also showed that Plaintiff's document was the final draft and the controlling agreement.

24, stevedoring expenses and related loading and discharging costs were to be borne by the charterer, Finora. Plaintiff's Ex. A–2, Cl. 5(b) & 24. Under Clause 20 and Clause 2 of the Voyage Charter, the ship's owners or disponent owners had certain responsibility for the payment of customary port expenses at loading and discharging, including agency fees, and for certain dues and taxes payable at loading and discharging. *Id.* at Cl. 2 & 20. All matters and expenses relating to the crew on the vessel were to be for the account of the owners or disponent owners under the Voyage Sub–Charter and Head–Time Charter.

11. Just prior to April 29, 1992, the vessel was at anchor in the Port of Mongla, in Bangladesh, having completed a previous charter with the World Food Program. All of her cargo had been discharged, and her holds were empty. On April 29, 1992, when the Master of the vessel tendered his "Notice of Readiness" to Finora's local agents in Mongla, V. Mueller was two payments behind in its Charter hire. According to the payment schedule the hire payments due on April 9th and April 24th had not been paid. Those two payments, together with the fuel on board the vessel for which V. Mueller had to pay Amitie Shipping under the terms of the Time Charter Party, totalled $181,142.80. Batayiannis Deposition, p. 93–95. In a series of telexes back and forth on April 28 and April 29, Moundreas demanded that V. Mueller execute a written assignment to Amitie Shipping of all the freight money that might be due V. Mueller, to cover all payments due. Batayiannis Deposition, p. 89–92.

12. The Voyage Sub–Charter Party between V. Mueller and Finora had been arranged for Finora by Herluf T. Johansen, chartering manager of Chase, Leavitt & Company, Inc. On April 28th, Johansen learned by telephone and telex from V. Mueller that it was having financial problems and that a portion ($180,800.00) of the freight monies which would be due V. Mueller from Finora had been assigned to Moundreas. Johansen immediately talked to Mr. Moun-

dreas by telephone from his Portland, Maine office and, in the course of the conversation, suggested to him that in view of the late Charter hire payments he withdraw the vessel from the V. Mueller Charter and that Finora would then be willing to assign its Charter Party with V. Mueller directly to Amitie Shipping.

13. After two hire payments had been missed by V. Mueller, Moundreas sought the advice of the M/V AMITIE's insurer, the Newcastle Protection & Indemnity Insurance Association (hereinafter "P & I Club") and its lawyers. Acting upon their instructions, Moundreas declined Johansen's suggestion to withdraw the vessel from its time charter, but insisted that any and all freights due V. Mueller from Finora be paid directly to Amitie Shipping.[4] According to Moundreas, "to withdraw a ship is the most serious decision a shipowner has to do in chartering." Moundreas Deposition, p. 21. "It's much more complicated because by withdrawing one ship, you have to face immediately the repercussions. Bunkers unpaid. Port expenses unpaid. Agents unpaid. Other obligations left open. And eventually, calls from charterers to you. So this matter is decided in conjunction with the lawyers, P & I club; and finally, the decision is taken when the whole thing is considered ripe." Moundreas Deposition, p. 13–14.

14. Although the vessel had issued its Notice of Readiness on April 29th, Finora, acting through Johansen, refused to accept it because of "unsettled disputes between charts and owners, concerning vessel release from previous agency commitment and charts coverage of vsl. port disbursements from vsl. previous cargo discharged at the Port of Mongla...." Plaintiff's Ex. C–5. According to Finora, the Charter actually began at 0600 hours on May 4, 1992, as indicated under the "Remarks" section of the Notice of Readiness. It is clear from the testimony that the vessel was not prepared to load cargo before May 4 because of ongoing disputes between V. Mueller and the vessel's previous agent in Mongla, and be-

---

4. Mr. Moundreas denies that he spoke to Mr. Johansen on April 29th by telephone, but the correspondence and the testimony of Mr. Batay-

iannis indicate otherwise and this court concludes that he did.

cause of a "shortlanding" claim by the owner of the cargo previously carried aboard the vessel.

15. The full assignment of freights from V. Mueller to Amitie Shipping never having taken place, Moundreas continued to put pressure upon V. Mueller to pay what was due. On May 13, 1992, Moundreas sent a telex to Johansen in Portland, reminding him that no freight was to be paid to V. Mueller "prior to our written consent." Plaintiff's Ex. C-7. On the same date, Johansen responded by first pointing out that no freight was due until all of the cargo had been loaded (the vessel at that point was en route to Calcutta, its second and final loading port). Plaintiff's Ex. C-8. He then went on to say as follows:

> as per yr fax, no frt to be paid until green light from your end, to which we have no objections. Head charts (period charts.) has only given authority for USD 180,-000—payment to you. Legally, we are in a dilemma here between what is morally prudent, and what is legally correct. So we kindly urge you to clarify with your period chart. (Reach a written agreement) how much to be remitted to whom, and such agreement must be confirmed from both parties to us. We would furthermore, require a written guarantee from head owners to the effect that any disputes between Head Owners and Timecharterers will not delay or affect the execution of the prevailing Charter Party.

*Id.* Moundreas did not respond to Johansen's telefax.

16. On June 2nd, Johansen was in Piraeus and had a meeting with Nicholas Moundreas and Aris Batayiannis in Mr. Moundreas' office. By that time V. Mueller had remitted to Amitie Shipping, on May 28th, the April 9th hire payment. It was still three hire payments behind (April 24, May 9 and May 24). In an exchange of telexes V. Mueller had advised Moundreas that it had paid Hire Number 6 (May 9th), and that Hires Number 4 and 5 (April 9 and April 24), together with the balance of the bunkers which were due, totalling $181,142.80, would be paid from the freight due from Finora. Moundreas rejected that proposition, demanded the full freight, and stated, "in this respect we invite you to give proper instruc-

tions to Messrs. Finora and confirm." Plaintiff's Ex. C-9.

17. In the June 2nd meeting Johansen again urged Mr. Moundreas to withdraw his vessel from the Time Charter and to enter into a direct contract with Finora. Moundreas again declined to do so upon advice of the P & I Club and his lawyers, but said that it was under consideration. Moundreas demanded that the entire freight be paid to his company, even though the full freight would exceed the amount of charter hire then due.

18. By June 2nd the vessel had completed its loading of cargo in Calcutta, bills of lading had been issued and released to Finora and the vessel had sailed for Durban, South Africa where she would refuel before sailing across to the East Coast of the United States. Johansen testified that at his meeting with Moundreas, Moundreas eventually said in effect, "Well, I'll take whatever I can now and then I will just hope they are going to pay me the rest later on."

19. The bills of lading having been released to Finora, Finora's contractual obligation was to pay 95% of the freight due within three (3) working days. By telex dated June 3rd, Plaintiff's Ex. F, V. Mueller gave Finora specific instructions to remit the sum of $181,142.80 directly to Amitie Shipping and the balance of $127,737.20 to it. The following day, June 4th, in another telex, Plaintiff's Ex. G, V. Mueller advised Finora that its patience was becoming exhausted and that, if the freight payments which it had instructed Finora to make were not made by the following day, it would not only seize Finora's cargo in the Port of Colombo, Sri Lanka (which it had a right to do under the Voyage Charter Party), it would also report Finora to "BIMCO", a shipowner's association. Such a report would have a harmful effect on Finora's future chartering plans.

20. On June 4th, Johansen was still in Piraeus. He sent an "URGENT" telex to Moundreas advising him that V. Mueller had instructed Finora to remit to Amitie Shipping the sum of $181,142.80 and that Finora had agreed to such remittance, provided Finora received by 4:00 p.m. that afternoon a letter from Amitie Shipping accepting the amount and agreeing that "such payment is allocated towards full or part coverage of

outstanding hire payments." Plaintiff's Ex. C–16. The letter was to be addressed to Finora Company, Inc. in New York. *Id.* Moundreas received the letter, but made no response. Finora then remitted that sum on June 5th, Friday, noon New York time, to a holding company for Amitie Shipping and, at the same time, sent the balance of the freight (less 5%) to V. Mueller, in the amount of $127,737.20, all by bank transfer.

21. On June 6th, a Saturday, Moundreas advised V. Mueller that the owners of the AMITIE tendered official notice of withdrawal, pursuant to Clauses 5 and 45 of the Time Charter, unless all outstanding hire had been received within seventy-two (72) hours. Plaintiff's Ex. C–18. Batayiannis advised Johansen of the withdrawal by telephone on the same morning, and also sent him a copy of the telex. Moundreas was not informed of the receipt of the $181,142.80 until mid-day on June 9th.

22. Upon receipt of a copy of the Notice of Withdrawal, Johansen immediately advised Amitie Shipping, through Moundreas, that it had become the responsible party for performance of the obligations under Finora's Charter Party and stated that in due course Finora would advise it of the discharge port as per the terms of the Charter Party. Plaintiff's Ex. C–22(A) & (B). On June 11th, Hughes, Hooker & Company, Solicitors of London, advised Johansen by telefax that the owners of the vessel would hold Finora fully responsible for all losses and damages sustained by the owners as the result of Finora's failure to pay the full freight to Amitie Shipping. Plaintiff's Ex. C–23(A) & (B). This telefax did not specify the basis for Finora's liability to the owners, nor did it mention the exercise of a maritime lien.

23. On June 18th, Batayiannis asked that Finora nominate the port on the U.S. East Coast for the discharge of its cargo. On June 29, Finora nominated Georgetown, South Carolina, as its sole discharge port. By telefax dated June 30, Hughes, Hooker & Co. confirmed the nomination and advised Finora that the vessel was proceeding to Georgetown, but that Finora would be held responsible for "all losses in respect of hire and bunker fuel required to ensure [sic] that the vessel arrives in the U.S. with all due

despatch [sic]. Further, that Owners, prior to discharge, will require to be fully secured." Plaintiff's Ex. D–26(A). Attached to the telefax was a "statement" advising that the sum of $484,600.00 was due to owners, which would have to be "covered prior to the vessel discharging her cargo at Georgetown." *Id.* at D–26(C).

24. The M/V AMITIE arrived off the port of Georgetown, South Carolina on July 11, where her owners ordered that she be anchored. For the next 10 days the attorneys for Plaintiff and Defendant exchanged telefaxes in which the London solicitors for Amitie Shipping repeatedly refused to permit the discharge of the cargo until they were "fully secured" for the "owner's lien" on the "cargo." This correspondence was the first in which the term "lien" was used, or in which references were made to the contractual basis of the lien. The London solicitors also refused, on Amitie Shipping's behalf, to pay for any port expenses of the vessel at Georgetown. After extended negotiations, Finora posted the sum of $150,000.00 to be held in escrow in order for the vessel to berth. The vessel then docked in Georgetown and her cargo was off-loaded.

25. Because of Amitie Shipping's refusal to pay any expenses of the vessel at discharge, Finora was required to pay the vessel's agency fees and other port expenses, which may be summarized as follows:

| U.S. Government Services | |
| --- | --- |
| U.S. Custom Service | $ 3,185.06 |
| U.S. Immigration | $ 90.00 |
| U.S. Custom Service | $ 18.00 |
| U.S. Custom Service | $ 18.00 |
| U.S. Custom Service | $ 18.00 |
| Pilotage | |
| Georgetown Pilot | $ 2,203.48 |
| Docking Pilot | $ 150.00 |
| Undocking Pilot | $ 150.00 |
| Towage | |
| From Stream to Pier 31 | $ 2,197.52 |
| From Stream to Pier 31 | $ 1,445.01 |
| Lines/Mooring | |
| Mooring & Unmooring | $ 825.00 |
| Dockage | |
| From 7/22 to 8/5 | $31,362.63 |
| Other Port Charges | |
| Overtime of South Carolina Port Authority during vessel's stay | $ 6,717.90 |
| Charts | $ 225.97 |
| Medical Expenses | $ 410.74 |
| Ship's Spares | $ 287.50 |
| Agency Charge | $ 4,706.80 |
| TOTAL | $54,011.61 |

Finora was not responsible for any of these charges under its Voyage Charter with V. Mueller.

Additionally, Finora paid the costs of discharging the cargo, as it was required to do under the Voyage Charter. Discharge of the cargo was completed on August 5, 1992.

26. The attorneys for Plaintiff and Defendant could not agree upon the terms of an escrow agreement. Eventually Finora brought this action for a declaratory judgment that it is entitled to a return of the $150,000 currently held in escrow and that it have an affirmative recovery from Amitie Shipping for reimbursement of the port expenses that were paid by Finora.

## III. THE CONTENTIONS OF THE PARTIES

### A. FINORA

Plaintiff Finora contends that it was bound by its contractual obligations with V. Mueller as set forth in the Voyage Charter Party; that, unless the owner of the vessel clearly gave notice of a lien and exercised its contractual lien upon the sub-freights, Finora could not make a payment of all of the sub-freights due directly to Amitie Shipping without breaching its payment obligation to V. Mueller; furthermore, even if notice of the contractual lien was given and the lien was clearly exercised, it would cover only the amount of charter hire due at the time it was asserted. Plaintiff claims that the lien was never properly exercised and that notice of the lien was not given and that instead, right up to the time of the withdrawal of the vessel, Moundreas attempted to persuade V. Mueller to instruct Finora to pay over the freights to Amitie Shipping as a form of assignment. V. Mueller did not agree to do so and Plaintiff claims that it had no choice other than to follow V. Mueller's instructions to split the freight. Alternatively, Finora contends that even if the lien was exercised, it was subsequently waived by Mr. Moundreas himself at the June 2nd meeting in Piraeus, when, according to Johansen, he said he would take whatever he could get from Finora.

Plaintiff further contends that when Amitie Shipping withdrew its vessel from the time charter, it then stepped into the shoes of the time charterer by operation of law and was thereafter subject to the terms and conditions of the Voyage Charter between Finora and V. Mueller, which was incorporated by reference into the bills of lading for the cargo. Under the terms and conditions set forth in the Voyage Charter, Amitie Shipping was under a legal obligation to discharge Plaintiff's cargo in Georgetown.

Plaintiff admits that it owes to Amitie Shipping the balance of the freight monies ($17,160.00). It contends, however, that the figure is more than offset by all of the charges which it was forced to pay in order to obtain its cargo. Those charges would ordinarily have been borne by V. Mueller, but after the charter was withdrawn became the obligation of the shipowner, Amitie Shipping. Finora seeks affirmative recovery for these charges after the application of a set-off for any sums that it owes in freight and demurrage.

Finally, Finora contends that the demurrage calculated in accordance with the Charter Party provisions and the relevant Statements of Facts amounts to $270.70.

### B. AMITIE SHIPPING

Defendant contends that it did in fact assert a lien on Finora's freights and that Finora was under a legal duty to pay all of its freights to Amitie Shipping. It further contends that Johansen's statement that no freight would "be paid until green light from your end" was tantamount to Finora's agreement that a lien on the freight had been asserted and that Amitie Shipping would protect it. Amitie Shipping also contends that while it had a legal duty to discharge Finora's cargo after it withdrew its ship from the Time Charter, it was governed exclusively by the terms of the bill of lading, which stipulated Wilmington, North Carolina as the port of discharge. It claims that Finora is responsible for all costs involved in diverting the ship to Georgetown, and that the ten days that the ship laid off Georgetown at anchor are properly charged against Finora.

Finally, the Defendant contends that the charter between Finora and V. Mueller commenced on April 29, the date of the giving of the Notice of Readiness at Mongla; that the twenty weather working days free time allowed to the charterers under Clause 23 of the Voyage Charter Party commenced at 0800 hours on that date; and that Finora owed demurrage at the rate of $5,000.00 per day at the conclusion of the twenty (20) days, such time to be based upon the "Statement of Facts" compiled in each of the three ports. It concedes that the Voyage Charter Party provided that the time in Calcutta would not commence until the vessel berthed.

The Defendant denies that it is legally responsible for the charges that would have been the responsibility of V. Mueller.

## IV. CONCLUSIONS OF LAW

### A. MARITIME LIEN ON SUB-FREIGHTS

At issue in this case is each party's respective entitlement to the $150,000.00 security currently held in escrow. Amitie Shipping argues that it properly exercised its maritime lien on the sub-freights and that Finora should now be required to pay, for a second time, the sum of $127,737.20, which Amitie Shipping asserts Finora paid to V. Mueller after receiving notice of the exercise of Amitie Shipping's maritime lien on these sub-freights. Finora seeks a return of the escrow money, contending that it did not receive clear notice of the exercise of the lien or of the contractual basis of the lien prior to its payment of the balance of the sub-freights to V. Mueller.

After giving full consideration to all of the testimony and the exhibits which have been offered, this court concludes that Amitie Shipping failed to properly perfect its contractual lien upon 95% of the sub-freights owed by Finora because Amitie Shipping failed to give clear notice to Finora of the exercise of its lien before payment of these sub-freights by Finora.[5]

In order for a shipowner to assert a maritime lien on sub-freights owed by a voyage charterer, with whom it is not in contractual privity, two requirements must be met. First, the shipowner must base the lien upon a contract which explicitly gives it a right to assert a lien against third-parties. *Berdex Int'l v. M/V KAPITAN GRISHIN*, 1992 A.M.C. 1559, 1564, 1992 WL 361752, at *2 (N.D.Cal.1992). A lien on sub-freights or third party cargo is not granted in general maritime law.

> A right to seize one person's goods for another person's debt must be clearly and distinctly conferred before a Court of justice can be expected to recognise it.

Tetley, *Maritime Liens & Claims* 349 (1985) (quoting *Turner v. Haji Goolam M. Azam*, [1904] A.C. 826 at p. 837). Second, the shipowner must properly perfect the lien by giving *clear* notice to the third-party of the existence of the lien and of its exercising of the lien *before* the third-party pays the sub-freights due. *Berdex*, 1992 WL 361752 at *3. If the shipowner fails to advise the third-party of the basis for its lien and of the fact that it is exercising its lien, and payment is subsequently made by the third-party without such notice, the lien on sub-freights is extinguished. *Biehl & Co. v. Apollonia*

5. In essence, Amitie Shipping contends that this case does not have as an issue "notice" of the lien. Amitie Shipping believes that its lien was "self-executing;" that is, Amitie Shipping argues that by its very existence it was effective and that no notice of that lien was necessary to assert it. Therefore, Amitie Shipping argues that Finora's knowledge of V. Mueller's default and subsequent payment of sub-freight to V. Mueller was done in bad faith. In other words, Amitie Shipping contends that no action was necessary on its part to assert its lien and that any payment of money to V. Mueller with knowledge of V. Mueller's default in payments to Amitie was made in bad faith. This court, however, as explained

further below, disagrees. If Finora had made payment to V. Mueller after proper notice of the lien by Amitie and with knowledge of the default of V. Mueller, then this court would find it necessary to analyze an argument of bad faith.

The fault in Amitie Shipping's argument is that it had no reserved lien at the time that Finora made payment to V. Mueller since Amitie Shipping failed to give Finora proper notice of its lien. Therefore, until Finora received proper notice of Amitie Shipping's lien, this court finds that there could have been no bad faith on Finora's part in paying V. Mueller. The requirements of a maritime lien are discussed below.

*Holding, Inc.,* 693 F.Supp. 457, 466–67 (E.D.La.1988) ("While the extent of notice is unsettled, a cargo owner must have notice of a shipowner's right to assert a lien—be the notice from language in the bill of lading or otherwise—in order for the shipowner to perfect the lien. If a cargo owner pays its owing freight to the bill of lading issuer before the cargo owner has legally proper notice of the shipowner's right to assert a lien for payments due to the shipowner from the bill of lading issuer, then the shipowner does not perfect its lien against the cargo owner."); *see also* Tetley, *Maritime Liens & Claims* 348–50, 352–53 (1985).

■ In this case, Amitie Shipping had a contractual lien on sub-freights by virtue of Clause 18 of the Time Charter Party. While Finora knew that V. Mueller was a "disponent owner" under some type of contractual arrangement with the owner of the AMITIE, it did not know what type of period charter party the vessel was under, nor did it know whether the charter party had a lien clause.[6] At no time prior to the payment of the sub-freights by Finora did Amitie Shipping advise Finora of the terms of its Time Charter with V. Mueller or that it had a lien clause; nor did Amitie Shipping or its agents notify Finora of the basis of the contractual lien on sub-freights or the fact that it was exercising such a lien. The word "lien" appears nowhere in any of the correspondence between the parties prior to payment, and there is little suggestion from Defendant's witnesses that they ever specifically used the word in their conversations with Johansen or otherwise put Finora on notice that Amitie Shipping was exercising its lien rights.

Although Moundreas and Batayiannis demanded on several occasions that Finora pay all of the freight due directly to Amitie Shipping, they characterized this transfer in their correspondence as an "assignment," and requested that V. Mueller instruct Finora to pay it as if it were a complete assignment of

the sub-freights due. This correspondence and these instructions do not amount to either clear notice of the contractual lien or the fact that a lien was being exercised. Even on June 4 and on June 6, when they knew that Finora was still being instructed to remit only partial payment, neither Moundreas nor Batayiannis ever specifically put Johansen on notice that the owners of the AMITIE asserted a contractual lien upon the sub-freights, nor did they ever identify the legal or contractual basis for their demand for the full freights.

■ Nicholas Moundreas and Aris Batayiannis are not only experienced charterers, but they are well-educated men who have legal training. Moundreas, who has been in the shipping business for thirty-two (32) years, is a graduate of the Athens School of Political Science and has a law degree from the University of Athens. Batayiannis has a Bachelors Degree in Maritime Transport from the City Polytechnic in London and obtained his Master's in Maritime Law at the University of Cardiff, Wales. More importantly, even before Finora paid any money to V. Mueller, Moundreas had sought the legal advice of Amitie Shipping's lawyers and the London solicitors for its Protection and Indemnity Club, who guided the ship's owners away from the withdrawal of the vessel and who presumably knew of the existence of the contractual lien. Despite this knowledge, neither Moundreas nor the London solicitors representing the ship's owners put Finora on notice of the existence of the lien until well after the payment of sub-freights was made. Under the circumstances, the lien was extinguished because clear notice, which was necessary to perfect the lien, was not given to Finora before payment. *Berdex,* 1992 WL 361752 at *3; *compare Tarstar Shipping Co. v. Century Shipline, Ltd.,* 451 F.Supp. 317, 320 n. 6 (S.D.N.Y.1978), *aff'd,* 597 F.2d 837 (2nd Cir.1979) (shipowner's notice specifically

---

**6.** Defendant cited no authority in the proposed order it submitted to this court. This court finds the authority cited by Amitie Shipping in its pretrial brief as allowing "constructive" notice, *The Solhaug,* 2 F.Supp. 294 (S.D.N.Y.1931) (mere reference to bill of lading issuer as a "charterer" is sufficient notice) and 2 *Benedict on Admiralty* § 45, at 3–75 to 3–76 (citing *Union*

*Industrielle et Maritime v. Nimpex Int'l, Inc.,* 459 F.2d 926, 929–30 (7th Cir.1972) (for proposition that a cargo owner has the duty, at the time of paying freight, to inquire whether any amounts are due and unpaid to the ship owner), unpersuasive, and adopts the reasoning of more recent cases that *clear* notice is required. *See Berdex,* 1992 WL 361752 at *3.

advised that lien was being exercised under terms of the charter party and of the amount of the lien).

Defendant relies upon Johansen's "green light" language in his telefax of May 13 as an acknowledgment of the existence of the owners's contractual lien. When viewed in context, this statement was made in the midst of negotiations for an "assignment" of freight and the telefax clearly reflects that Johansen's authority to make any direct payment to the owners was limited by the instructions he had received from V. Mueller. Moreover, he urged Moundreas to straighten out the dispute between Amitie Shipping and its charterer, V. Mueller, and to confirm to Finora whatever agreement was reached. In the context of these assignment negotiations, Johansen told Moundreas that while Finora had no objection to following the instructions of Moundreas, Moundreas must first obtain the agreement of Finora's contracting party and confirm the agreement. No such agreement between Amitie Shipping and V. Mueller was ever reached, with the result that Finora necessarily followed instructions of the party with which it was in contract and treated the payment as a partial assignment of the sub-freights that were then due. Johansen's telefax, when viewed in the context of these assignment negotiations, did not rise to the level of an acknowledgment of the existence of a contractual lien or the fact that it had been exercised by Amitie Shipping.

The fact that the lien was never properly exercised is reinforced by the actions of Moundreas and Amitie Shipping's London solicitors. During the June 2nd meeting, Moundreas demanded an assignment of the sub-freights for more than the amount that was then due in unpaid hire. Similarly, as late as June 30, the London solicitors for Amitie Shipping demanded some $480,000.00, which was substantially more than the total sub-freights that were owed for the voyage. These actions are inconsistent with the exercise of a contractual lien on sub-freights. Under U.S. law, a shipowner's lien on sub-freights is limited to the amounts which may be due under the Voyage Charter. *American Steel Barge Co. v. Chesapeake and Ohio Coal Agency Co.*, 115 F. 669, 672 (1st Cir. 1902). The actions of Moundreas during the course of these negotiations, and the later actions of Amitie Shipping's solicitors in demanding more money than was due in sub-freights, clearly suggest that neither party was intentionally exercising a contractual lien on the sub-freights, nor were they providing any adequate notice of the basis of the shipowner's assertion of its rights to the sub-freights.

For these reasons, this court concludes that Defendant Amitie Shipping failed to properly exercise its maritime lien on 95% of the sub-freights prior to payment by Finora; that Plaintiff Finora is not required to pay to Amitie Shipping the sum of $127,737.20; and that Finora is entitled to a return of the $150,000.00 in security currently held in escrow, plus accrued interest.[7]

## B. REMAINING FREIGHT, DEMURRAGE AND PORT EXPENSES

This court also concludes that Amitie Shipping's attempt to withdraw the vessel from charter after the voyage commenced did not become effective as to Finora until after the cargo had been discharged in Georgetown. *See Cardinal Shipping Corp. v. M/S SEISHO MARU*, 744 F.2d 461, 468 (5th Cir.1984) (quoting *Luckenbach v. Pierson*, 229 F. 130, 132 (2d Cir.1915) ("Maritime law ... required [Amitie Shipping] to reland the cargo before effecting withdrawal of the vessel.... [T]he withdrawal of a vessel from a charter party means that the owner shall deprive the charterer of any further enjoyment or use of the vessel and take it into his own exclusive possession. This can be presently done, even where the vessel is at sea, provided she is light; but if there be any cargo on board no withdrawal can be made until the cargo be relanded if the vessel is at the loading port, or until it be discharged if she is at sea or at destination...." This rule serves to protect both the vessel owner who is able to regain 'control of his vessel' by

---

7. Since this court finds that the conversations and correspondence between the parties could not be construed as a proper exercise of a maritime lien, there is no need to discuss waiver of any lien.

discharging the cargo, ..., and the cargo owner whose property will be unloaded at either of the two safest points—the loading port or the destination. The *Luckenbach* rule draws a reasonable line; once a vessel has put out to sea, she must continue the voyage and discharge her cargo before withdrawing from the charter.")) Therefore, once the vessel put out to sea, Amitie Shipping was obligated to continue the voyage and to discharge the cargo before its withdrawal of the vessel from the Time Charter Party with V. Mueller could be legally effective. Because the head time-charter could not be terminated, the voyage sub-charter continued in effect and was unaltered by the notice of withdrawal. *See Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 193 (9th Cir.1962); *Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co.*, 227 F.Supp. 872, 881 (S.D.N.Y.1964). Moreover, the terms of the bill of lading which governed the contract of carriage incorporated the terms of the Voyage Charter Party, and the Voyage Charter became the operative document upon which the carriage was based. *See Son Shipping Co. v. De Fosse & Tanghe*, 199 F.2d 687, 688 (2nd Cir.1952) ("Where terms of the charter party are ... expressly incorporated into the bills of lading they are a part of the contract of carriage and are binding upon those making claim for damages for the breach of that contract just as they would be if the dispute were between the charterer and the shipowner."); *State Trading Corp. of India v. Grunstad Shipping Corp. (Belgium) N.V.*, 582 F.Supp. 1523, 1524 (S.D.N.Y.), *aff'd,* 751 F.2d 371 (2d Cir. 1984) (same proposition). Amitie Shipping concedes in its argument and in the testimony submitted to the court that the bills of lading were binding on it as the ocean carrier. Batayiannis Deposition, p. 54–55.

In effect, when Amitie Shipping gave its notice of withdrawal to V. Mueller during the ocean voyage, it dismissed V. Mueller and accepted the obligations to perform the carriage of the cargo under the Voyage Charter. Specifically, if it chose not to re-land the cargo at the loading port, it was obligated to sail to the discharge port nominated by Finora, and to pay whatever port expenses that would have been required of V. Mueller. *Biehl & Co.,* 693 F.Supp. at 467–68. In turn, once it validly perfected its contractual lien, it received the right to have any unpaid freight paid to it, and it became entitled to recover any demurrage calculated under the terms of the Voyage Charter.[8] *Id.*

Amitie Shipping's actions at the discharge port, which were done under the guidance of their London solicitors, failed to conform to its obligations under the bill of lading and incorporated Voyage Charter. The vessel delayed in berthing for some ten (10) days on the basis that the discharging of the cargo would result in a loss of Amitie Shipping's lien against the "cargo." As correctly noted by Finora, this lien does not exist when the cargo is owned by a third-party who is not in contractual privity with the ship's owner. *Goodpasture, Inc. v. M/V POLLUX,* 602 F.2d 84, 87 (5th Cir.1979). Amitie Shipping brought the vessel to berth only after receiving security in the amount of $150,000.00 from Finora. In effect, Amitie Shipping held the ship and its cargo hostage under the mistaken belief that it had a lien on the cargo for some $480,000.00, a claim which it eventually withdrew. Batayiannis Deposition, p. 59–60. In spite of these actions, Amitie Shipping seeks recovery in the amount of $57,348.96, which represents a ten (10) day loss in charter hire plus the cost of two tons of fuel used during the delay. Amitie Shipping cannot point to any contractual provision which would entitle it to recover this component of damages. For these reasons, this court concludes that Amitie Shipping is not entitled to recover this portion of its damages.

Amitie Shipping also refused to pay any of the vessel's port expenses upon her berthing. These expenses, which totalled $54,011.61, were the responsibility of the owner or disponent owner, and this court concludes that under the terms of the Voyage Charter Party, Amitie Shipping had the responsibility to pay this amount, which was instead paid by

---

8. Although Amitie Shipping failed to perfect its lien before Finora's payment of 95% of the sub-freights, it has clearly perfected its lien as to the sub-freights and demurrage that are still owed by filing its answer and counter-claim in this case.

Finora. Additionally, as between Finora and Amitie Shipping, Amitie Shipping should bear these expenses as expenses of the vessel, as opposed to expenses related to the cargo. *Biehl & Co.*, 693 F.Supp. at 468. Under the circumstances, Plaintiff Finora is entitled to reimbursement from Amitie Shipping for these expenses, which were properly chargeable to Amitie Shipping under the terms of the Voyage Charter, after it had dismissed V. Mueller by giving notice of withdrawal.

■ Additionally, Amitie Shipping seeks to recover demurrage in the amount of $83,535.17. A voyage charterer is not responsible for demurrage caused by delays which were attributable to the fault of the shipowner or disponent owner or those for whom they are responsible. *U.S. v. Atlantic Refining Co.*, 112 F.Supp. 76, 80 (D.N.J.1951); *Venore Transportation Co. v. The President of India*, 1973 A.M.C. 1309, 1311 (S.D.N.Y. 1972); *Cargill Americas v. Baker, Carver & Morrell*, 1979 A.M.C. 1819 (S.D.N.Y.1979). Demurrage is normally calculated as commencing after the expiration of allowable laytime for the vessel at the loading and discharge ports. Gilmore & Black, *The Law of Admiralty* § 4–8, at 210–213 (2d Ed.1975). The parties to a charter party are free to determine how lay-time will be calculated and when it will commence, and claims for demurrage are governed by the terms of the applicable Charter Party. *Venore*, 1973 A.M.C. at 1306.

In his deposition testimony, taken *de bene esse* and submitted to this court, Mr. Batayiannis of Amitie Shipping concedes that any demurrage to which Amitie Shipping would be entitled would be calculated under the terms of the Voyage Charter. Batayiannis Deposition, p. 60–61. Amitie Shipping's lay-time calculations do not, however, conform with the terms of the Voyage Charter Party. Conversely, Finora's lay-time calculations accurately reflect the terms of the Voyage Charter Party, and this court concludes that, under the terms of the Charter Party, Amitie Shipping is only entitled to recover the amount of $270.70 for demurrage.

Amitie Shipping is entitled to recover from Finora the 5% balance of sub-freights owed to V. Mueller, in the amount of $17,160.00. This court further concludes, however, that the amounts owed in reimbursement by Amitie Shipping to Finora for port expenses under the Voyage Charter and the amounts owed by Finora to Amitie Shipping for the balance of the sub-freights and for demurrage under the Voyage Charter are set-off, leaving a balance of money due Finora by Amitie Shipping in the amount of $36,580.91. *See Bergeria v. Marine Carriers, Inc.*, 341 F.Supp. 1153, 1155–56 (E.D.Pa.1972) (allowing set-off and recognizing right to affirmative recovery on set-off claim).

## C. PREJUDGMENT INTEREST

■ Prejudgment interest in admiralty cases is governed by maritime law, and it is routinely granted to a prevailing party in the absence of circumstances that would make it inequitable. *Platoro Ltd. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, and Furniture, in a Cause of Salvage, Civil and Maritime*, 695 F.2d 893, 906–07 (5th Cir.), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). An admiralty court has discretion to determine the applicable interest rate and the date from which prejudgment interest is to run. *George's Radio & Television Co. v. Insurance Co. of North America*, 536 F.Supp. 681, 683 (D.Md. 1982). The reason for selecting a particular interest rate and period, however, must be disclosed. *Ameejee Valleejee & Sons v. M/V VICTORIA U.*, 661 F.2d 310, 314 (4th Cir. 1981). In calculating prejudgment interest, courts applying maritime law typically refer to the average yield of a United States Treasury Bill during the appropriate time period. *See Joye v. Heuer*, 813 F.Supp. 1171 (D.S.C. 1993); *Bosnor, S.A. de C.V. v. Tug L.A. BARRIOS*, 796 F.2d 776, 786–87 (5th Cir. 1986); *Western Pacific Fisheries, Inc. v. SS PRESIDENT GRANT*, 730 F.2d 1280, 1288–89 (9th Cir.1984) (approving adoption of one-year treasury bill rate at set out in 28 U.S.C. § 1961).

This court concludes that Plaintiff Finora is entitled to recover prejudgment interest on the principal sum of $36,580.91 at the rate of 3.61% commencing on August 5, 1992, which is the day on which payment of those

expenses should have been made by Amitie Shipping.[9]

## V. CONCLUSION

It is therefore,

**ORDERED,** that Plaintiff, Finora Company, Inc., is entitled to a return of the $150,000.00 currently held in escrow, plus accrued interest. It is further

**ORDERED,** that Plaintiff, Finora Company, Inc., is entitled to judgment in its favor on the counterclaim in the total sum of $36,580.91, plus prejudgment interest at the rate of 3.61% from August 5, 1992 until the date of this order, post-judgment interest thereafter until paid and court costs.

**AND IT IS SO ORDERED.**

### APPENDIX A

### PREJUDGMENT INTEREST CALCULATION

| | | |
|---|---|---|
| 1. | 07/23/92 | 3.51% |
| 2. | 08/20/92 | 3.41% |
| 3. | 09/17/92 | 3.13% |
| 4. | 10/15/92 | 3.24% |
| 5. | 11/17/92 | 3.76% |
| 6. | 12/10/92 | 3.72% |
| 7. | 01/07/93 | 3.67% |
| 8. | 02/04/93 | 3.45% |
| 9. | 03/04/93 | 3.21% |
| 10. | 04/06/93 | 3.37% |
| 11. | 04/30/93 | 3.25% |
| 12. | 05/27/93 | 3.54% |
| 13. | 06/24/93 | 3.54% |
| 14. | 07/22/93 | 3.58% |
| 15. | 08/19/93 | 3.43% |
| 16. | 09/16/93 | 3.40% |
| 17. | 10/14/93 | 3.38% |
| 18. | 11/16/93 | 3.57% |
| 19. | 12/09/93 | 3.61% |
| 20. | 01/06/94 | 3.67% |
| 21. | 02/03/94 | 3.74% |
| 22. | 03/03/94 | 4.22% |
| 23. | 04/01/94 | 4.51% |
| 24. | 04/07/94 | 3.37% |
| 25. | 04/29/94 | 5.02% |

AVERAGE INTEREST RATE      90.30/25 = 3.61%

---

**9.** *See infra* p. 1310 (Appendix A) (court's calculation of the average rate of interest for the time period beginning August 5, 1992 and ending on the date of this order).